Edwin C. HOLLENBECK and Kathryn J. Hollenbeck, Wade G. Ellis and Anita L. Ellis, Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellee.

No. 23722.

United States Court of Appeals, Ninth Circuit.

Feb. 5, 1970.

Robert Jensen (argued), David E. Agnew, of Agnew, Miller, Carlson & Powers, Los Angeles, Cal., for appellants.

John S. Stephan (argued), Elmer J. Kelsey, Lee A. Jackson, Attys., Dept. of Justice, Tax Div., Johnnie M. Walters, Asst. Atty. Gen., Tax Div., Dept. of Justice, Washington, D. C., for appellee.

Before BARNES and TRASK, Circuit Judges and PLUMMER, District Judge.*

TRASK, Circuit Judge:

Edwin C. Hollenbeck and his wife, Kathryn, and Wade G. Ellis and his

---

* Hon. Raymond E. Plummer, Chief Judge, U. S. District Court for the District of Alaska, sitting by designation.

wife, Anita, appeal from a decision of the Tax Court, entered August 19, 1968, which upheld the Commissioner's assessment of deficiencies in the Hollenbecks' and Ellis' joint individual income tax returns in the amounts of $8,991.73 and $7,689.47 respectively. Jurisdiction of this court is under 26 U.S.C. § 7482.

Appellants contend that they are entitled to ordinary loss treatment on the capital stock they received in cancellation of the indebtedness of Imperial Concrete Products Corporation to them under the provisions of the Small Business Tax Revision Act of 1958, as "Section 1244" stock. Section 1244 of the Internal Revenue Code of 1954. 26 U.S.C. § 1244. Appellee, Commissioner of Internal Revenue, urges the correctness of the Tax Court decision to the effect that the stock in question did not qualify under Section 1244 for reasons stated in that opinion. We agree with appellee and affirm the decision of the Tax Court.

The relevant transactions out of which the deficiencies arose are as follows: Hollenbeck and Ellis were general partners in Southwestern Investment Company, which successfully engaged in the business of filling and draining land in the Coachella Valley of southern California. On April 14, 1960, Southwestern organized Imperial Concrete Products Corporation as a corporation for the purpose of conducting a similar business in the Imperial Valley of southern California. The initial capital was furnished by the partnership and in return for it $12,000.00 in capital stock was issued to Southwestern. No other capital stock was issued except the Section 1244 stock. The corporate form of ownership was chosen in order that a manager, who would run the corporation, could be rewarded with a stock ownership in the company if it proved profitable. It was contemplated that, over a five-year period, he would acquire a twenty per-cent interest in the corporation. In actuality this never developed and no stock was sold to him.

Imperial obtained its other capital requirements by means of loans from Southwestern. Between April, 1960 and July, 1961, Imperial received the proceeds of seventeen loans in a total amount of $150,130, evidenced by demand, unsecured promissory notes at six per-cent interest. Fourteen of the notes were never repaid, leaving a total indebtedness of $109,130. No interest was either paid or accrued to Southwestern.

Imperial proved to be an unprofitable venture. Ellis testified at trial that the company decided in August or September of 1961 to cease operations. On November 29, 1961, it adopted a plan, under Section 1244 of the Internal Revenue Code, to enable it to issue stock for cancellation of the debt held by Southwestern. This plan was implemented on December 15, 1961, and 1,091 shares of the newly authorized stock were issued to Southwestern in cancellation of the then existing debt of Imperial to Southwestern. On December 23, 1961, Imperial's directors decided to dissolve the corporation and six days later its assets were distributed to and liabilities assumed by Southwestern. Southwestern sustained a loss of $92,658.24 in respect to the 1091 shares of Section 1244 stock.

Appellants, Southwestern's partners, claimed on their 1961 federal individual income tax returns an ordinary loss deduction on "Section 1244 stock". Section 1244 permits an individual or partnership to take an ordinary loss deduction—rather than the usual capital loss deduction—on the sale or exchange of common stock in a "small business corporation" if the corporation meets certain requirements, among them that the stock be issued for "money or other property (other than stock and securities)." 26 U.S.C. § 1244(c) (1) (D).

The Commissioner determined that Section 1244 was not available to appellants as the loans from Southwestern to Imperial had become "equity capital" of Imperial at the time of the adoption of the Section 1244 plan. Thus, the stock had been issued for the equivalent of

"stock and securities", and an ordinary loss deduction could not be claimed upon the sale or transfer of the stock. The Commissioner assessed deficiencies amounting to the difference between ordinary loss deductions and capital loss deductions on the Section 1244 stock. The Tax Court affirmed these deficiencies. Hollenbeck v. Commissioner of Internal Revenue, 50 T.C. 740 (1968).

■ Appellants urge that Section 1244 should not be so narrowly read. They point out that the stock when issued complied with the formal requirements of Section 1244, and that the Commissioner and the Tax Court were in error in determining, in spite of formal compliance, that the stock was issued for "stock or securities" and not in exchange for "money or other property" as set out in the statute. It is, of course, not only the prerogative but the duty of the Commissioner and the Tax Court to carefully examine the transaction behind its formal facade to be certain that it is what it purports to be and that the substance of the transaction is within the governing statute. This particularly applies to advances of funds or property to a corporation by those possessing an ownership interest in it. Gilbert v. Commissioner of Internal Revenue, 262 F.2d 512 (2nd Cir. 1959); Lundgren v. Commissioner of Internal Revenue, 376 F.2d 623, 626 (9th Cir. 1967).

"Whether advances to a corporation are contributions to capital or loans 'is essentially a question of fact upon which the taxpayer has the burden of establishing his right to such deduction' (Matthiessen v. Commissioner of Internal Revenue, 2 Cir., 1952, 194 F. 2d 659, 661). The form of the transaction is not controlling, but rather the substance. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596; Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981; 1432 Broadway Corporation v. Commissioner of Internal Revenue, 1945, 4 T.C. 1158, affirmed per curiam 2 Cir.,

1947, 160 F.2d 885. Where the loss sought to be regarded as a bad debt 'is as a matter of substantial economic reality a loss of risk capital' (Gilbert v. Commissioner of Internal Revenue, 2 Cir., 248 F.2d 399, 407), it will be disallowed.

"The term 'substantial economic reality' is merely a way of expressing the fact that the determination whether the funds advanced are to be regarded as a 'capital contribution' or 'loan' must be made in the light of all the facts of the particular case. Rarely should any one element be determinative." Gilbert v. Commissioner of Internal Revenue, supra, 262 F.2d at 513–514.

■ The Tax Court's determination that the monies loaned to Imperial by Southwestern and evidenced by promissory notes had become "equity capital" of Imperial at the time of its adoption of the Section 1244 plan and no longer constituted a debt was supported by several significant facts: The notes were demand notes bearing interest and contained the ordinary attributes of debt. The first two represented the purchase price of property and the expenses incurred by Southwestern in organizing Imperial. The others were issued over a relatively short period of time prior to the date upon which the decision was made to abandon the enterprise. Appellant Ellis, a CPA, testified that Imperial's record of continuous losses made it impossible for the company to obtain any outside financing. Seventeen notes in all were issued. Three were repaid but not in order of issue. None of the notes was secured. No interest was ever paid to or accrued by Southwestern. It appears evident that the treatment accorded the lending of the money and its repayment is not consistent with the ordinary relation of debtor and creditor. See John Town, Inc., 46 T.C. 107, 131 (1966); 1432 Broadway Corporation, 4 T.C. 1158 (1945), aff'd, 160 F.2d 885 (2nd Cir. 1947). On the basis of all the facts it appears that there is substantial

evidence to support the determination of the Tax Court that the advances by Southwestern to Imperial constituted "equity investment" or stock and not debt within the contemplation of Section 1244(c) (1) (D). We hold that the Court's determination was not clearly erroneous. Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960).

Appellants argue forcefully from cases holding that cancellations of debt in consideration of issuance of stock constitute capital contributions and are the equivalent of a payment of money, that the stock issued here qualifies under the statute. Howard W. Starr, 1 B.T.A. 681 (1925); Chicago I. & L. Ry. 10 B.T.A. 1143, 1147–1158 (1928); Estate of Mallory, 27 B.T.A. 750 (1933). See also Commissioner of Internal Revenue v. Auto Strop Safety Razor Co., Inc., 74 F.2d 226 (2nd Cir. 1934); Helvering v. American Dental Co., 318 U.S. 322, 328, 63 S.Ct. 577, 87 L.Ed. 785 (1943); Lidgerwood Mfg. Co. v. Commissioner of Internal Revenue, 229 F.2d 241, 242 (2nd Cir. 1956).

We do not find that the cases cited by appellants lead to the result which appellants seek. We do not think that Congress intended Section 1244 to be used in the manner contemplated by appellants. As in Gregory v. Helvering, 293 U.S. 465, 470, 55 S.Ct. 266 (1935), "the transaction upon its face lies outside the plain intent of the statute." Section 1244 was adopted as part of the "Small Business Tax Revision Act of 1958". The Report on that Act, submitted to the House of Representatives by Congressman Wilbur K. Mills of the House's Committee on Ways and Means, contained the following language:

"II. General Statement

"This is a bill to aid and encourage small business. * * * The goals of the bill are summarized below.

"(1) The bill is designed to increase the volume of outside funds which will be made available for the financing of small business. Encouragement for external financing is provided by the ordinary loss treatment accorded investments in small business which do not prove to be successful. In this manner the risk element in small-business investments will be decreased for all such investments, including the enterprises which ultimately succeed, as well as those which fail.

\* \* \* \* \* \*

"III. General Explanation

\* \* \* \* \* \*

"This provision is designed to encourage the flow of new funds into small business. The encouragement in this case takes the form of reducing the risk of a loss for these new funds.

\* \* \* "

H. Rept. No. 2198, 85th Cong., 1st Sess. (1958).

The Section 1244 plan adopted and implemented by appellants in no way aided or encouraged Imperial. The volume of outside funds flowing to Imperial was not increased. Southwestern had completed all of its contributions to Imperial, and Imperial's directors and Southwestern as its sole stockholder had decided to abandon operations of the corporation prior to the adoption of the plan. The plan served no economic purpose other than securing a tax benefit for appellants. Appellant Ellis testified that the partners of Southwestern decided to "cease the operation of Imperial" about August or September of 1961. He was then asked:

"Q. What action did Southwestern take with respect to the then outstanding indebtedness of Imperial to Southwestern when it decided to cease this active operation of the business?

"A. Well, we took steps to have it converted to what we thought was Section 1244 capital stock.

"Q. What were the purposes of that step, Mr. Ellis?

"A. Well, primarily to put ourselves in a position to be able to receive at

**6**

some point in time an ordinary loss deduction on the stock of Imperial Concrete Products, if we should have to liquidate the company.

"Q. Do you recall when the decision of Southwestern was reached to liquidate the Imperial Corporation?

"A. Not exactly, but I would say—I mean, this was a possibility that we discussed several times, but the actual decision I would say probably was the latter part of November, the first part of December of 1961."

On November 29, 1961, the Section 1244 plan was adopted and the shares issued. On December 23, 1961, the Board elected to dissolve Imperial and on December 29, 1961, its assets were transferred to Southwestern which assumed its liabilities.

From this sequence of events it appears clear that the cancellation of Imperial's debt to Southwestern in return for Section 1244 stock was not for the purpose of continuing the operation of this small business, because the decision to cease operation had been made in August or September before. The only purpose realistically was to attempt to reconstitute the debt to obtain an advantageous tax treatment for appellants. This would defeat rather than promote the statutory purpose. Bruce v. United States, 279 F.Supp. 686, 689–900 (S.D. Tex.1967), aff'd, 409 F.2d 1317, 1318 (5th Cir. 1969).

We believe that this purpose alone, unaccompanied by a purpose beneficial to the small business corporation or without reasonable prospect of becoming economically beneficial, is insufficient, under the particular circumstances of this case, to bring the transaction within Section 1244.

Appellee raises an additional issue on this appeal concerning the applicability of Section 1244(d) (1). Since what has been said is dispositive of the case, this argument need not be considered.

The judgment of the Tax Court is affirmed.