BERNARD and SONIA OPPENHEIM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Oppenheim v. Commissioner
Docket No. 1727-69
United States Tax Court
T.C. Memo 1973-12; 1973 Tax Ct. Memo LEXIS 270; 32 T.C.M. (CCH) 37; T.C.M. (RIA) 73012; January 23, 1973, Filed *270 Anthony S. Battaglia and Howard P. Ross, for the petitioners. Robert J. Shilliday, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION
HALL, Judge: Respondent has determined deficiencies in petitioners' Federal income taxes for the years and in the amounts as follows: 1961
$3,577.83
1962
3,357.30
1963
201.04
1964
80.49
1965
1,567.36
Total
$8,784.02 2 The deficiencies determined to be due from petitioners for 1961, 1962 and 1963 are due solely to the disallowance of a net operating loss carryback from 1964. Disposition of the issue for decision in 1964 will, therefore, resolve the tax liability for 1961, 1962 and 1963. Concessions having been made by the parties, the only issues remaining for decision are as follows: 1. Was the loss sustained by petitioners in 1964 as a result of worthlessness of their Tampa Auto Brokerage, Inc. stock entirely a long term capital loss, or was any part of it an ordinary loss by virtue of section 1244? [1]
2. Are petitioners entitled to deduct $1,800 as the expense of maintaining an office in their home in 1965, or any amount more than the $719.73 respondent allowed? FINDINGS *271 OF FACT Petitioners, husband and wife, resided at Tampa, Florida, at the time they filed the petition. They filed joint Federal income tax returns for the years 1961, 1962, 1963, 1964 and 1965 with the district director in Jacksonville, Florida. After filing their 1964 return, petitioners applied for a tentative carryback adjustment to 1961, 1962 and 1963 based on their 1964 return. Hereinafter "petitioner" refers to Bernard Oppenheim. 1. Section 1244 Issue. During 1963 and 1964 petitioners owned all the stock of Tampa Auto Brokerage, Inc. (hereinafter "Tampa Auto"), a Florida corporation. Tampa 3 Auto was in the used car business and had been incorporated in 1955. Petitioners owned all 10 of the issued and outstanding shares of Tampa Auto as of June 30, 1963, for which they had a $10,000 basis. The books of Tampa Auto showed the following "Accounts Payable," "Notes Payable," and "Loans Payable - Stockholder" as of June 30, 1963: ACCOUNTS PABABLE
Trade
$10,157.53
Atlas Insurance Company
2,591.40
Independent Motors
6,397.23
TAB Realty Company
2,616.64
$21,762.80
NOTES PAYABLE
Allen Parker - floor plan
$27,421.12
W. G. Quiqley
5,000.00
Coca Cola
150.15
Quiqley/Chunn
10,000.00
Exchange National Bank
1,735.12
First National Bank
291.53
Florida Mutual Association
3,250.00
47,847.92
LOANS PAYABLE - STOCKHOLDER
24,774.68
Total
$94,385.40
Petitioner *272 claims he had made outstanding unpaid loans to Tampa Auto of $54,629.95 as of June 30, 1963, consisting of the following: 4 ACCOUNTS PAYABLE
Atlas Insurance Company [2] *273 *274 *275 *276 *277 *278 *279 $2,591.40
Independent Motors [2]
6,397.23
TAB Realty Company [2]
2,616.64
$11,605.27
NOTES PAYABLE
W.G. Quigley
$5,000.00
Quigley/Chunn
10,000.00
Florida Mutual Association
3,250.00
18,250.00
LOANS PAYABLE - STOCKHOLDER
24,774.68
Total
$54,629.95
Generally, at least for certain tax purposes, stock is issued when paid for, whether or not a certificate is prepared and delivered to the stockholder. See Wesley H. Morgan, 46 T.C. 878 (1966). Here the corporation was authorized to sell the 40 shares only for $50,000 cash. There is no evidence the stock was ever paid for, only petitioner's testimony that he intended to pay for it by means of cancellation of $50,000 of Tampa Auto's debt. The "debt" being in the form of an open account, the normal way "payment" through debt cancellation would be consummated would be through an appropriate entry on the corporation's books. No such entry was made, nor is there any other evidence of more than an ineffectual intention to issue the shares. *280 We conclude that petitioners have failed to prove that the shares were in fact issued. However, even if the 40 shares were in fact issued by Tampa Auto to petitioner, we further hold that such shares do not qualify as section 1244 10 stock. To qualify as section 1244 stock, the stock must be issued "for money or other property (other than stock and securities)." Section 1244(c) (1) (D). The regulations provide that, "Stock issued in consideration for cancellation of indebtedness of the corporation shall be considered issued in exchange for money or other property," but that stock issued in exchange for stock or securities of the issuing corporation does not qualify as section 1244 stock. Section 1.1244(c)-1(f) (1), Income Tax Regs.
One of the purposes for enacting section 1244 was to encourage the flow of new capital into small businesses. H. Rept. No. 2198, 85th Cong., 1st Sess. (1958), 1959-2 C.B. 709, 711. As this Court stated in J. Paul Smyers, 57 T.C. 189, 196 (1971): The legislative history makes it clear that the congressional intent behind excluding stock or securities of the issuing company as proper consideration for section 1244 stock is that in many cases the equity *281 interest which would be exchanged for the section 1244 stock would be an already existing equity interest in the issuing corporation. In such cases no new capital is being generated. Capital funds already committed are merely being reclassified for tax purposes. See Hollenbeck v. Commissioner, 422 F. 2d 2 (C.A. 9, 1970), affirming 50 T.C. 740 (1968); Raymond G. Hill, 51 T.C. 621 (1969); Wesley H. Morgan, 46 T.C. 878 (1966), and cases cited therein. See also Marcia B. Kaplan, 59 T.C. No. 17 (1972). We find in this case that the advances in question had already been committed to the risks of the business, and the attempted formal conversion of that "debt" into stock did not result in bringing new capital into Tampa Auto. The 40 shares of purported section 1244 stock were in reality issued for stock of the issuing corporation. Whether a purported debt is to be considered an equity interest for tax purposes is a question of fact to be decided in light of all the 11 particular facts, with the petitioners bearing the burden of proof. See John Kelley Co. v. Commissioner, 326 U.S. 521 (1946). The Court must consider whether the form in which the transaction has been cast has substantial *282 economic reality. Gilbert v. Commissioner, 262 F. 2d 512 (C.A. 2, 1959), affirming a Memorandum Opinion of this Court, certiorari denied 359 U.S. 1002 (1959). A myriad of cases have considered such questions, and no useful purpose would be served by yet another lengthy recitation of the familiar factors to which the trier of the fact must look in drawing the line. See Harlan v. United States, 409 F. 2d 904 (C.A. 5, 1969); Tomlinson v. 1661 Corporation, 377 F. 2d 291 (C.A. 5, 1967); United States v. Snyder Brothers Company, 367 F. 2d 980 (C.A. 5, 1966), cert. denied 386 U.S. 956 (1967); Montclair v. Commissioner, 318 F. 2d 38 (C.A. 5, 1963), affirming a Memorandum Opinion of this Court; Gilbert v. Commissioner, supra; Aqualane Shores, Inc., 30 T.C. 519 (1958), affirmed 269 F. 2d 116 (C.A. 5, 1959); Wilshire & Western Sandwiches, Inc. v. Commissioner, 175 F. 2d 718 (C.A. 9, 1949), reversing a Memorandum Opinion of this Court. The facts in this case show the following: There were no certificates of indebtedness, but merely book entries recording "Loans Payable - Stockholder" and "Notes Payable" (listing the names of individuals other than petitioner). There is no evidence of an unconditional *283 obligation to repay the advances on demand or at a fixed maturity date; the advances were made on open account. There is no evidence that interest was ever payable or paid in any amount on any of the advances. Petitioner has presented no evidence that when the advances were made there was any reasonable expectation that the advances would ever be repaid, let alone presented any evidence that full repayment could reasonably have been anticipated 12 without regard to whether the business venture proved successful. We know only that by June 30, 1963, the corporation was in such weakened financial condition that no lender could have expected to be repaid unless the business venture proved successful. There was never any effort on the part of petitioner to collect these advances; instead he formally committed them to the business by purportedly cancelling the advances in payment of the 40 shares of stock which were allegedly issued sometime after July 29, 1963. Finally, there was at all times complete identity between shareholder and debtor with respect to these advances; petitioners owned all the issued and outstanding stock of Tampa Auto at the time the advances were made and at the *284 time the 40 shares of stock were "issued." Such identity of interest subjects nominal debt to particularly close scrutiny. Wilshire & Western Sandwiches, Inc. v. Commissioner, supra. We hold that even if the 40 shares of stock allegedly issued on or after July 29, 1963, were in fact issued, they were issued for stock (equity) of the issuing corporation, and therefore fail to qualify as section 1244 stock. As a result, petitioners are not entitled to an ordinary loss on these shares becoming worthless in 1964, but instead are entitled to a capital loss of $43,024.68 with respect to the 40 shares of purported section 1244 stock. Since we find that petitioners are not entitled to an ordinary loss on the worthlessness of the 40 shares of stock in 1964, it follows that they are also not entitled to any net operating loss carryback to the years 1961, 1962 and 1963. Respondent raises a number of other grounds for his contention that petitioners' loss was capital rather than ordinary in nature, but in view 13 of our holding it is not necessary to reach such issues. 2. Expense of maintaining an office in the home. Respondent allowed petitioners a $719.73 business expense deduction for *285 the cost incurred in maintaining an office in their home in 1965. The burden is on petitioners to prove that they are entitled to any greater amount. Welch v. Helvering, 290 U.S. 111 (1933); Rule 32, Tax Court Rules of Practice.
Petitioners contend, but offered no evidence, that the house has a useful life of 25 years instead of 40 years; that the furniture has a useful life of 5 years instead of 10 years and a basis for depreciation of $2,200 instead of $1,556.41; and that repairs made in 1965 were $90 instead of $60. Petitioners have failed to prove that they are entitled to more than the $719.73 allowed in 1965. Decision will be entered under Rule 50 Footnotes
1. All references are to the Internal Revenue Code of 1954, as amended. ↩
2. Atlas Insurance Company, Independent Motors and TAB Realty Company were petitioners' wholly-owned corporations. The "Accounts Payable" to Atlas Insurance Company, Independent Motors and TAB Realty Company were loans made by those corporations to Tampa Auto and not advances by petitioner. The amounts represented by "Notes Payable" to Quiqley, Quiqley/Chunn and Florida Mutual Association were advanced by petitioner (and not by the named creditors) to Tampa Auto. The total amount of petitioner's "loans" to Tampa Auto was $43,024.68 ($18,250.00 plus $24,774.68). None of the "Notes Payable" or "Loans Payable - Stockholder" was evidenced by notes or other written evidence of debt, none bore a maturity date, and no interest was paid thereon. No demand for payment was ever made of Tampa Auto and petitioner made no attempt to force collection of these notes payable or loans. Moreover, the notes payable and loans never were paid. 5 Tampa Auto had a net operating loss of $68,109.56 for the fiscal year ended June 30, 1963, and $39,705.84 for the fiscal year ended with the liquidation in March 1964. Tampa Auto had a deficit in net worth of $31,510.08 as of June 30, 1963, and $71,215.92 as of March 1964. During the years in issue Tampa Auto was a small business corporation as defined in section 1244(c) (2), which derived more than half its aggregate gross receipts from sources other than royalties, rents, dividends, interest, annuities and sales or exchanges of stock or securities. On July 29, 1963, the board of directors of Tampa Auto held a special meeting to adopt a stock plan intended to qualify under section 1244. The following are the relevant portions of the minutes of that meeting: WHEREAS, the Board of Directors of Tampa Auto Brokerage, Inc., wishes to offer for sale and issue 40 shares of its common stock authorized by its Certificate of Incorporation; and WHEREAS, IT IS further deemed desirable that the offer, sale and issue of such shares be carried out in such a manner that, in the hands of qualified shareholders, such shares will receive the benefits of Section 1244 of the Internal Revenue Code of 1954; and WHEREAS, there is not now outstanding any offering, or portion thereof, of this Corporation to sell of issue any of its stock; and WHEREAS, this Corporation is a small business corporation as defined in Section 1244(c) (2) of the Internal Revenue Code of 1954; NOW, THEREFORE, BE IT RESOLVED, that the President of this Corporation and such other officers as he may designate be, and hereby are, authorized and directed to offer for sale and to sell and to issue up to 40 shares of the common stock in the total amount of $50,000.00 at $1,250.00 per share payable in cash during the period from the date hereof to twelve months hereafter or to the date when this Corporation shall make a subsequent offering of any stock, whichever shall first occur. 6 Petitioner intended that Tampa Auto issue 40 shares of stock to him some time on or after July 29, 1963, and before March 1964, and petitioner intended to pay for the stock by the cancellation of $50,000 of Tampa Auto's $54,629.95 of "debt." No bookkeeping entries were made to reflect this transaction, nor did the final tax return of Tampa Auto reflect this transaction. Tampa Auto prepared a stock certificate dated July 29, 1963, showing 40 shares issued to petitioner, but the certificate remained attached to the corporation's stock book and there is no evidence the Florida State stamp tax, required with respect to issuance of stock, was ever paid. The 40 shares of stock were not paid for and were not in fact "issued." No loans were made to Tampa Auto by any banks or anyone else after the adoption of the stock plan. Tampa Auto was liquidated in March 1964. The stock of Tampa Auto became worthless during 1964. Petitioner's "loans" to Tampa Auto were committed to the risks of the business and constituted equity rather than debt from their inception. On their 1964 Federal income tax return, petitioners reported a $50,000 ordinary loss from the worthlessness of petitioner Bernard Oppenheim's 40 shares of Tampa Auto stock allegedly qualifying under section 1244, a $10,000 net long term capital loss from the worthlessness of petitioners' original 10 shares of Tampa Auto stock, and a $32,553.73 net short term loss from the worthlessness of a nonbusiness bad debt owed petitioners by Tampa Auto. Petitioners' 1964 return includes a declaration under section 1.1244 (e) (1) (B), Income Tax Regs., listing Tampa Auto's address, and 7 stating that petitioners had acquired section 1244 stock from Tampa Auto by issuance after incorporation for forgiveness of indebtedness, and that the nature of the consideration was cash. In its notice of deficiency respondent disallowed petitioners' $50,000 deduction claimed as an ordinary loss from the worthlessness of section 1244 stock of Tampa Auto, alleging that petitioners failed to establish that such stock qualified as section 1244 stock and the basis, if any, of such stock. Respondent determined that petitioners realized a long term capital loss from the worthlessness of Tampa Auto's capital stock in the amount of $52,191.14, in lieu of the $10,000 as reported on petitioners' 1964 return, calculated as follows: Original 10 shares stock
$10,000.00
Additional equity
43,024.68
Total long term loss
$53,024.68
Less collections on 1959 installment sale - short term gain
(833.53)
Excess long term loss over short term gain
$52,191.15
By reason of this adjustment, $1,000 of this amount was allowed as a capital loss deduction in 1964, and the balance was allowed as a capital loss carryover to 1965. 2. Expense of maintaining an office in the home. In their 1965 joint Federal income tax return petitioners claimed an $1,800 business deduction for the expense of maintaining an office in their home. Respondent allowed only $719.73 of the amount claimed. Respondent determined that the room used for an office occupied 10% of the entire area of the house. He allocated the expenses of the 8 office as follows: depreciation $200 (based upon $40,000 cost of house depreciated over 40 years using the double declining balance method); utilities $120; telephone $216; repairs $60; maid service $208; furniture depreciation $155.64 (using a 10 year life based upon cost of $2750 less $1193.59 for depreciation previously claimed). The total expenses determined by respondent were $959.64 from which he deducted 25% or $239.91 for personal use, leaving a deductible cost of an office in the home of $719.73. The room petitioners claimed as an office was a large family room with two couches, a color television, an easy chair, a desk, rugs and a large fireplace. Petitioners also used other parts of the house for storage of business files. The home office expense of petitioners does not exceed $719.73 for 1965. OPINION
1. Section 1244 Issue. Respondent contends that the 40 shares of stock purportedly issued for cancellation of indebtedness were never in fact issued, but that even if properly issued they were issued in exchange for stock (equity) of the issuing corporation and do not qualify as section 1244 stock, and that the loss on such stock becoming worthless is a capital loss. Petitioners assert that the 40 shares of stock were in fact issued on or after July 29, 1963, and that they were section 1244 stock, and therefore the loss incurred on their becoming worthless in 1964 was an ordinary loss. We agree with respondent on both counts. The burden of proving that Tampa Auto issued petitioner the 40 shares of stock is on petitioners. Rule 32, Tax Court Rules of Practice. 9 Petitioners have failed to meet their burden. A resolution of the board of directors authorized Tampa Auto to sell 40 shares of stock for $50,000 cash ($1,250 per share). Petitioners contend that the stock was issued and was paid for by cancellation of $50,000 of Tampa Auto's debt. The facts show that no bookkeeping entries were made to reflect this transaction and the final tax return of Tampa Auto, filed for the period ending June 30, 1964, also did not reflect this transaction. Tampa Auto prepared a stock certificate dated July 29, 1963, showing 40 shares issued to petitioner, but the certificate remained attached to the corporation's stock book.There is no evidence that the Florida State stamp tax, required with respect to issuance of stock, was ever paid. Fla. Stat. Ann. §201.05 (1971)
[3]↩