JOHN D. TONEY, SR. AND MARY R. TONEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Toney v. Commissioner
Docket No. 29384-84.
United States Tax Court
T.C. Memo 1986-69; 1986 Tax Ct. Memo LEXIS 538; 51 T.C.M. (CCH) 472; T.C.M. (RIA) 86069; February 13, 1986. *538 Petitioner owned all the stock of Real/Tech, a small business corporation. Real/Tech was heavily indebted to petitioner and others and had a note outstanding for $1,500,000 to Commonwealth Federal Savings and Loan on which petitioner was primary guarantor. Petitioner agreed to transfer Real/Tech to CU, an unrelated corporation, and to assume or liquidate all of Real/Tech's liabilities except the note to CFSL. CU agreed to assume primary liability for the note, to issue 25 additional shares of Real/Tech stock to petitioner, and to give petitioner an option to purchase certain real estate. Held: Petitioner is not entitled to deduct his losses on the transfer of Real/Tech as ordinary losses under section 1244 of the Internal Revenue Code. Petitioner's advances to Real/Tech did not establish a true indebtedness from Real/Tech to petitioner so petitioner's forgiveness of the liability supposedly in exchange for the 25 shares of stock did not qualify the stock as section 1244 stock. H. Lawrence Yancey, for the petitioners. Howard P. Levine, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined deficiencies [1] in petitioners' Federal *539 income tax as follows: Year
Deficiency
1976
$2,220.00
1977
5,822.00
After concessions by both parties, the issue remaining for our decision is whether petitioners are entitled to ordinary loss deductions in connection with certain stock issued by a corporation in exchange for cancellation of indebtedness under section 1244. [2]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, supplemental stipulation of facts, and joint exhibits are incorporated herein by this reference. The pertinent facts are summarized below. Petitioners John D. Toney, Sr. and Mary R. Toney are husband and wife whose legal residence was Little Rock, Arkansas at the time they filed their petition in this case. [3] *540 Petitioners filed a timely joint Federal income tax return for 1979 with the Internal Revenue Service Center in Austin, Texas. During the years at issue, petitioner was employed as a real estate agent in Little Rock, Arkansas. He decided to invest in a real estate development project with one Dewey Buffington (Buffington). In 1972, petitioner and Buffington purchased a 300 acre tract of land in Little Rock, Arkansas for development into residential real estate. [4] They obtained a loan of $2.6 million from Commonwealth Federal Savings and Loan (CFSL) [5] with which to purchase the property. Petitioner, Buffington, and their wives were listed as personal guarantors on the loan. On September 28, 1972, petitioner and Buffington formed a corporation called Tall Timber Development Corporation (Tall Timber or the corporation), for the purpose of engaging in real estate development. Upon forming Tall Timber, petitioner and Buffington each transferred $5,000 to the corporation as a contribution to capital along with the title to the recently acquired property. *541 They each were issued 50 shares of the stock of Tall Timber. [6] The encumbrance on the property was also assigned to Tall Timber. However petitioner and Buffington remained primarily liable on the note. The property, later named Pecan Lake, was divided into a residential subdivision of 302 lots. Tall Timber was incorporated under the laws of the state of Arkansas. It had one class of stock outstanding and qualified as a small business corporation under section 1244(c)(3). A section 1244 plan was adopted at the first meeting of the incorporators of Tall Timber and was approved thereafter by the Board of Directors. Shortly after petitioner and Buffington began the development of Pecan Lake the real estate business experienced a slump. Tall Timber had difficulty selling its lots which resulted in it being unable to pay the expenses it incurred, including interest on the debts it incurred. Tall Timber needed additional capital to pay its mounting expenses but was unable to borrow additional funds due to its current indebtedness. Petitioner made several *542 loans to Tall Timber in 1976 to enable it to pay real estate taxes, accounting fees, attorney's fees, and other business debts. The loans were in the amounts of $10,620, $63,204.61, and $18,070.13. The loans were evidenced by promissory notes executed by Tall Timber to petitioner. Petitioner was to be repaid for these loans from later real estate sales. He did not, however, receive any payments of interest or principal. Tall Timber was having difficulty during this time making payments to CFSL on its $2.6 million loan. CFSL began to exert pressure on Tall Timber to make its interest payments. Tall Timber's difficulty eventually resulted in CFSL filing a suit for foreclosure against Tall Timber on September 8, 1978. The bank was concerned that petitioner and Buffington were having personal conflicts which affected their ability to manage Tall Timber. CFSL advised petitioner that either he or Buffington should purchase the other's interest, or that Tall Timber should be sold to new investors. Shortly thereafter, petitioner purchased Buffington's interest in Tall Timber, and Buffington was released from liability on the CFSL note. CFSL then dismissed their foreclosure suit. After *543 petitioner purchased Buffington's interest in Tall Timber he decided to change the corporation's name. He felt that Tall Timber had a bad reputation. On January 18, 1979, he changed the name to Real/Tech Corporation (Real/Tech). Petitioner was the president and sole shareholder of Real/Tech. He then took several actions to stimulate sales in Real/Tech including hiring an advertising agency, and purchasing billboards. Sometime thereafter Dan Robinson (Robinson), a sales agent hired by petitioner to help stimulate sales in Real/Tech, approached petitioner with an offer to purchase his interest in Real/Tech. Robinson was acting as the broker for Construction Unlimited (CU), the actual offeror. Matkin stated that CFSL encouraged petitioner to sell his interest to CU. CFSL was concerned that petitioner was having difficulty communicating with the Pecan Lake Homeowner's Asociation, and that petitioner lacked expertise in building and marketing houses; his experience had been solely in selling real estate. In contrast, Fred J. Brei, Jr. (Brei), who was the sole shareholder of CU, had built houses in the Chicago area. CFSL also felt that petitioner was running out of money and that *544 Brei was more financially sound. Ernest Matkin, who had managed the loan department of CFSL when the loan was originally made, stated that during this time CFSL would not have loaned any more money to petitioner, or to Real/Tech, because of petitioner's difficulty in making payments on the $2.6 million loan, and his lack of expertise in marketing and building houses. On July 10, 1979, petitioner and Brei signed an agreement for the sale of Real/Tech. Real/Tech was insolvent at the time this agreement was executed. As part of the agreement petitioner was to reduce Real/Tech's liabilities to $1.5 million, which would be owed to CFSL. The remainder of Real/Tech's liabilities were to either be assumed or liquidated by petitioner. CFSL required that for Brei to take title to Real/Tech he had to assume primary liability for Real/Tech's debt to CFSL. Petitioner was to remain secondarily liable. Real/Tech, CU, and Brei executed a new mortgage with CFSL for $1,121,759.85 the proceeds of which were used to retire Real/Tech's prior debt with CFSL. The agreement for CU to purchase Real/Tech was consummated on August 2, 1979. As of December 1, 1978, Tall Timber had incurred a debt of $109,976.60 *545 with Metropolitan National Bank (Metropolitan). This debt was accumulated by Tall Timber over a period of time on their open line of credit with Metropolitan. Being aware of Tall Timber's financial difficulties, Metropolitan sought additional security for this debt. On August 2, 1979, petitioner executed his promissory note to Metropolitan to pay this debt using a parcel of real property owned by him and his wife as collateral for the debt. On August 1, 1979, petitioner signed an agreement cancelling all indebtedness owed to him by Real/Tech in return for Real/Tech's issuance to him of 25 shares of stock. This indebtedness amounted to $689,887.17, [7] or $27,595.48 per share. Real/Tech was insolvent when the stock was issued. A consent memorandum issued by Real/Tech in connection with the issuance of its stock stated that The offer, sale and issue of such shares be effectuated in such a manner that qualified shareholders may receive the benefits of section 1244 of the Internal Revenue Code. Petitioner then sold his 25 shares of Real/Tech stock to CU. In return, CU assumed primary liability for CFSL's loan to Real/Tech and petitioner was given an option to purchase some of Real/Tech's *546 property. Petitioners incurred a loss in 1979 of $100,764 on the sale of the stock to CU. They filed an application for tentative refund (Form 1045) with the Internal Revenue Service seeking to carry the loss back to the taxable years 1976 and 1977 on the theory that the loss was an ordinary loss incurred on the sale of section 1244 stock. Respondent disallowed this claim. OPINION The issue in this case is whether the loss incurred by petitioners on the sale of stock in Real/Tech to CU qualifies as an ordinary loss under section 1244. The parties agree that the section 1244 plan adopted by Real/Tech was valid and that Real/Tech was a small business corporation as defined in section 1244(c)(3)(A). Hence, we are left *547 with the narrow issue of whether the 25 shares of stock issued to petitioner by Real/Tech constituted section 1244 stock. Section 1244 provides that, subject to certain conditions and limitations, a loss on the sale or exchange (including a transaction treated as a sale or exchange) of "section 1244 stock" which would otherwise be treated as a loss from the sale or exchange of a capital asset shall be treated as an ordinary loss. See sec. 1.1244(a)-1, Income Tax Regs.
"Section 1244 stock" is defined in section 1244(c)(1) as stock in a domestic corporation if (A) at the time such stock is issued, such corporation was a small business corporation, (B) such stock was issued by such corporation for money or other property (other than stock and securities), and (C) such corporation, during the period of its 5 most recent taxable years ending before the date the loss on such stock was sustained, derived more than 50 percent of its aggregate gross receipts from sources other than royalties, rents, dividends, interests, annuities, and sales or exchanges of stocks or securities. Section 1.1244(c)-1(d), Income Tax Regs., provides that stock issued in exchange for the cancellation of indebtedness *548 of the corporation is considered to be issued in exchange for money or other property. However, if the indebtedness is evidenced by a security it is not viewed as section 1244 stock. Sec. 1.1244(c)-1(d), Income Tax Regs.
Section 1244 was first enacted as part of the Small Business Tax Revision Act of 1958. Section 1244 was designed to encourage the flow of new funds into small businesses. H. Rept. No. 2198 (1958), 1959-2 C.B. 709, 711. This encouragement was supplied by allowing shareholders an ordinary loss on their investments should they prove unsuccessful. However, only new infusions of capital were to receive this special treatment. Therefore stock or securities of the issuing corporation were excluded as proper consideration for section 1244 stock under section 1244(c)(1)(B). Such consideration would be an influx of an already existing equity interest generating no new capital and not effectuating the purpose of section 1244. H. Rept. 2198, supra;Smyers v. Commissioner,57 T.C. 189 (1971). Respondent contends that petitioners should not be allowed an ordinary loss on the sale of their Real/Tech stock to CU because the stock does not qualify as section 1244 stock since *549 it was not issued for money or other property as required by section 1244(c)(1)(B). Rather respondent argues when Real/Tech issued its 25 shares of stock to petitioner the transaction was not an exchange of stock for the cancellation of indebtedness but was instead an exchange of stock for an equity interest in Real/Tech which prevents the stock issued from qualifying as section 1244 stock. The consideration qualifies as an equity interest, respondent contends, because when petitioner paid debts of the corporation he was not loaning money to it but was instead making a capital contribution due to the fact that Real/Tech was insolvent and that it was unlikely that petitioner would ever be repaid, and that the advances that had been made by petitioners and others to Real/Tech were already so deeply committed to Real/Tech that they must be classified as either "stock or securities." Therefore respondent concludes that petitioners' deduction of an ordinary loss should be disallowed. To the contrary petitioners argue that the ordinary loss should be allowed because the stock issued by Real/Tech to petitioners was in reality section 1244 stock. Petitioners contend that the stock was issued *550 in exchange for petitioners' cancellation of Real/Tech's indebtedness to him which is valid consideration under section 1244 since it is viewed in the same way as money. Petitioners reject respondent's contention that the notes issued by Real/Tech to petitioners represented in substance equity. Petitioners contend that the paramount consideration in determining whether the notes constituted debt or equity is the parties' intention and that the parties intended for the advances to be treated as an indebtedness, as further evidenced by the formal execution of notes, the requirement that interest be paid, and the fact that payment was not contingent. Therefore petitioners conclude, they should be allowed an ordinary loss on the sale of the section 1244 stock. For the reasons detailed below, we agree with respondent. Whether the stock issued to petitioners by Real/Tech was section 1244 stock hinges on the question of whether the consideration exchanged by petitioner for the stock was cancellation of debt or equity. If the consideration exchanged by petitioners was cancellation of a debt then it is viewed the same as money which is valid consideration under section 1244. If, however, *551 the notes petitioner held were already so deeply committed to Real/Tech that its financial position could not be realistically benefitted by any change of characterization then the notes are in reality equity, or risk capital and are insufficient consideration for section 1244 stock. See section 1.1244(c)-1(d). Kaplan v. Commissioner,59 T.C. 178 (1972). This determination requires a careful examination of all the relevant facts and circumstances. Kelley Co. v. Commissioner,326 U.S. 521 (1946). Our examination is crucial since it is the substance of the economic relationship, not its form, that determines the incidence of Federal income taxation. Gregory v. Helvering,293 U.S. 465 (1935). Several of the factors that will be utilized to assist us in our determination are: 1) whether the debt evidenced the formal attributes of indebtedness, e.g., an unconditional obligation to pay a fixed sum on demand or at a fixed maturity date in the not unreasonable future; a fixed rate of interest payable unconditionally; a preference over all classes of stock in liquidation, and an absence of voting rights at any time; 2) whether the circumstances indicate that the debt could be enforced according *552 to its terms; and 3) whether the parties were in fact enforcing the debt according to its terms. Hollenbeck v. Commissioner,50 T.C. 740, 749 (1968), affd. 422 F.2d 2 (9th Cir. 1969). Other factors that are considered in determining whether advances made by a shareholder are risk capital, or bona fide indebtedness, include undercapitalization, participation in management by one of the creditors, lack of interest charges, and identity of creditor and shareholder interest. Smyers v. Commissioner,supra at 198. Applying the above factors to the case at hand, we find that the notes held by petitioner evidenced most of the formal attributes of indebtedness. The notes were payable on demand or at their maturity date. The notes alos bore a set rate of interest. However, when the notes are examined in light of the circumstances that surrounded their execution it is unrealistic to assume that the notes would ever be paid. Real/Tech was incorporated with an initial capital contribution of only $10,000. The corporation immediately assumed a $2.6 million debt and also immediately began to experience difficulty in generating cash flow. See Kaplan v. Commissioner,supra. Real estate sales *553 were in a slump. Real/Tech did not have money to pay ordinary business expenses such as attorneys fees, or real estate taxes. These expenses along with current interest expenses on the $2.6 million loan were paid by petitioner. By this time it was clear that Real/Tech was in danger of imminent foreclosure on its loan by CFSL, and in fact CFSL sued for foreclosure. Matkin stated that at this time CFSL would not have loaned any more money to either petitioner or Real/Tech due to their financial difficulties. [8] CFSL began to encourage petitioner to liquidate his investment. Based upon the above analysis of Real/Tech's financial situation it is clear that it was unrealistic for petitioner to assume that he would be repaid. Moreover, and perhaps more importantly for determining whether the indebtedness was bona fide, the parties did not in actuality enforce the obligation. Real/Tech never made any payments *554 to petitioner of principal or interest on these notes. After a careful consideration of all of the above factors we conclude that petitioner's advances constitutied equity investments. Hollenbeck v. Commissioner,supra. While the notes contained all the formal attributes of debt none of the principal or interest was ever repaid and, due to Real/Tech's financial situation, it was unrealistic for petitioner to expect repayment. It also appears that Real/Tech was initially undercapitalized since initial capital contributions were $10,000, and indebtedness was $2.6 million. Such undercapitalization is viewed as very strong evidence that a genuine indebtedness never occurred. Tyler v. Tomlinson,414 F.2d 844, 849 (5th Cir. 1969); Kaplan v. Commissioner,supra.Moreover, petitioner, one of Real/Tech's creditors, was also in the corporation's management operation. This fact undermines the traditional debtor/creditor relationship and makes it unlikely that the demand provisions on the notes would ever be exercised. [9] Thus, since the 25 shares of stock issued to petitioner were not issued in exchange for cancellation of true indebtedness, the stock did not qualify as section 1244 stock. *555 As additional support for our decision, we find that the exchange herein did not serve to effectuate the congressional purpose behind section 1244. Section 1244 was enacted, as discussed previously, to encourage small business development by the infusion of new funds into small businesses. Petitioners contend that Real/Tech's issuance of the 25 shares of stock did effectuate the purpose of section 1244 because the consideration given was an investment in a continuing business. Real/Tech continued as an entity, petitioners urge, under Brei; petitioner just relinquished control. Moreover petitioners contend that the cancellation and assumption of indebtedness by petitioner was an investment for the additional reason that petitioner expected to earn a profit from the land he later purchased from Real/Tech using the option he received as part of the exchange. We fail to find the relevance of the latter argument. We are not concerned with whether petitioner expected to make a gain on the sale of land he purchased from Real/Tech as a result of the agreement. The important *556 factor for our purposes is the relationship of petitioner and Real/Tech at the time the Real/Tech stock was issued. Was petitioner making an investment in Real/Tech by assuming and cancelling indebtedness? We think not. When petitioner cancelled the debt owed to him by Real/Tech he was not making a new investment -- he was in fact liquidating his interest in Real/Tech. Real/Tech was insolvent at the time. He was simply attempting to change the character of his equity interest in Real/Tech by having additional shares of stock issued to him which he claimed was 1244 stock for tax purposes. A tax break was not intended by Congress to result from such a charade and it does not convert an ordinary equity interest into a section 1244 stock interest. Morgan v. Commissioner,46 T.C. 878, 892-893 (1966). Furthermore, petitioner's main purpose in selling Real/Tech to Brei or CU was to relieve himself as primary obligator on the mortgage note to CFSL. He received no tangible consideration for selling the 25 shares of Real/Tech stock to Brei or CU -- he simply gave it up --and retained no interest in Real/Tech. Therefore we find that the transaction herein does not serve to effectuate the *557 purpose of section 1244. The consideration petitioner exchanged for the stock, i.e., the advances he had made to Real/Tech, was an already existing equity interest in the issuing corporation. In such a case no new capital is being generated. Instead capital funds already committed are merely being reclassified for tax purposes resulting in no attendant infusion of capital into the corporation's financial position. Smyers v. Commissioner,supra at 196; see also Hollenbeck v. Commissioner,422 F.2d 2 (9th Cir. 1970), affg. 50 T.C. 740 (1968). Section 1244 was designed to encourage investments in small businesses, allowing them to continue in business, not to bail out creditors by providing them with ordinary losses after the corporation has ceased doing business. See, e.g., Hill v. Commissioner,51 T.C. 621 (1969). Congress did not intend for transactions like this one to benefit from the provisions of section 1244. [10]
Accordingly, since we have found that the advances made by petitioner constituted additional *558 equity or risk capital and that the issuance of Real/Tech stock did not effectuate the Congressional purpose behind section 1244, we hold that the stock issued by Real/Tech was not section 1244 stock. [11] Hence, respondent's determination is sustained. Decision will be entered under Rule 155.
Footnotes
1. These deficiencies were determined as a result of petitioners' carryback of a net operating loss from 1979 to 1976 and 1977.↩
2. All section references are to the Internal Revenue Code of 1954, as amended, and in effect during the taxable years at issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
3. All references to "petitioner" refer to John D. Toney, Sr.
4. The record does not indicate how title to this property was held. ↩
5. CFSL subsequently merged with Superior Federal and continued in business as Superior Federal. To avoid confusion however we will continue to refer to the bank as CFSL.↩
6. Respondent has conceded that this initial contribution was pursuant to section 1244 and that the stock issued was section 1244↩ stock.
7. The record is somewhat confusing as to the sources of this indebtedness. From our reading of the record Real/Tech's debt to petitioner included 3 loans made to Real/Tech in 1976 of $10,620, $63,204.61, and $18,070.13; petitioner's assumption of a loan made to Real/Tech by Metropolitan of $109,976.60; an interest payment made by petitioner to CFSL of $220,000 and various other debts incurred by Real/Tech but paid by petitioner due to Real/Tech's financial difficulties.↩
8. The fact that an outsider would not have made the loans in question is one factor that courts consider as evidence that purported debt was not to be repaid according to its terms. See John Town, Inc. v. Commissioner,46 T.C. 107, 131 (1966), affd. 376 F.2d 455↩ (7th Cir. 1967).
9. Indeed petitioner stated at trial that he did not expect repayment of the debts he assumed for Real/Tech in 1979.↩
10. Section 1244(c) of the Code, in defining "section 1244 stock," does not itself mention cancellation of indebtedness as an acceptable consideration for section 1244↩ stock.
11. See also Nelson v. Commissioner,T.C. Memo. 1984-465↩.