*Decisions will be entered under Rule 50.*

EDWIN C. HOLLENBECK AND KATHRYN J. HOLLENBECK, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT
WADE G. ELLIS AND ANITA L. ELLIS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 209-66, 210-66.   Filed August 19, 1968.

*David E. Agnew*, for the petitioners.
*James J. Cotter*, for the respondent.

FORRESTER, *Judge:* The respondent has determined deficiencies in the 1961 individual income taxes of petitioners in the following

amounts: Docket No. 209–66, Edwin C. and Kathryn J. Hollenbeck, $8,991.73; docket No. 210–66, Wade G. and Anita L. Ellis, $7,689.47. Upon a joint motion of the parties the above docket numbers were consolidated for purposes of trial, briefing, and decision. The issue presented is the same in both cases; it is whether or not the petitioners are entitled to deduct as an ordinary loss their distributive share of a partnership's loss under section 1244. The partnership, Southwestern Investment Co., hereinafter referred to as "Southwestern," was the sole shareholder of Imperial Concrete Products, Corp., a California corporation, hereinafter referred to as "Imperial" or "the corporation." Southwestern acquired some of its stock in Imperial in exchange for cancellation of the latter's indebtedness to it, and the question now before us is whether this stock qualified as section 1244 stock so that losses on its disposition, pursuant to a liquidation, are deductible as ordinary losses.

### FINDINGS OF FACT

At the time the petitions were filed the petitioners in each docket respectively were husband and wife, residing in Indio, Calif. Both pairs of petitioners filed timely joint Federal income tax returns for the year 1961 with the district director of internal revenue in Los Angeles, Calif. Both wives are parties to this litigation solely because of having filed joint returns, consequently, Edwin C. Hollenbeck and Wade G. Ellis will be referred to as the petitioners. A stipulation of facts was filed and its terms are incorporated by this reference.

The petitioners are two of the partners of Southwestern, a general partnership whose members are connected with or interested in the filling and drainage business in the Coachella Valley, Calif. The partnership set up a company to engage in the construction of irrigation and drainage systems in the Coachella Valley. It then leased to this company the necessary construction equipment and real estate. On April 14, 1960, the partnership organized Imperial to engage in a similar business in the Imperial Valley of California. Initially the partnership intended to lease Imperial whatever equipment and real estate it needed, but these plans were changed when it became apparent that it would not be possible to run Imperial with the employees of the Coachella operation, and that a resident manager in the Imperial Valley would have to be employed. The partners felt that in order to get a good manager they would have to offer him an opportunity to acquire an equity interest in the company as the business grew. This decision to offer the manager stock caused the partners of Southwestern to rethink their original plan of leasing Imperial its assets. Had the manager acquired any stock in Imperial then there would no longer have been an identity of interest between Southwestern and Imperial. Without such identity of interest the amount of the rental

which would have been charged Imperial would become a subject about which differences might arise between the manager and Southwestern. Rather than become involved in such a dispute, it was thought better to lend[1] Imperial the money to acquire its own real estate and equipment and then, when the business got going in 9 months to a year, to obtain bank financing and repay the partnership. As matters ultimately developed the manager was a failure and he was never sold any stock.

Imperial was not successful because the partners overestimated the size of the market for its services, underestimated the strength of the competition, and were overly optimistic in their expectations for its new manager. The hoped-for profits never materialized, and as a consequence Imperial was never in a position to obtain bank financing.

Imperial began losing money from the time it was first started. When the California commissioner of corporations issued a permit to Imperial on December 21, 1960, authorizing the sale of its common stock, he imposed an escrow agreement—the terms of which prohibited sale of such stock to anyone except the partners of Southwestern. The reasons given for imposing this escrow arrangement as a condition precedent to permitting sale of the stock were that Imperial had sustained losses, was in a poor current position, and its shares would have a negative book value when issued.

Imperial issued $12,000 worth of capital stock to Southwestern. This would have been sufficient capital if Imperial had leased its assets, but when it was decided to have Imperial buy its assets it became necessary for Southwestern to get funds into the corporation's hands.

Southwestern had already acquired certain property for Imperial, and this was transferred to it in return for a note which is so indicated on the following table which summarizes the loans Southwestern made to Imperial:

| Note No. | Amount | Issue date | Date paid | Note No. | Amount | Issue date | Date paid |
|---|---|---|---|---|---|---|---|
| 1 | $5,000 | 4-2-60 | | 11 | $5,000 | 9-28 | |
| 2 | [1] 31,130 | 4-1-60 | | 12 | 5,000 | 10-25 | |
| 3 | 5,000 | 6-2 | | 13 | 10,000 | 12-12 | |
| 4 | 5,000 | 6-27 | | 14 | 10,000 | 12-14 | |
| 5 | 10,000 | 7-5 | | 15 | 10,000 | 2-13-61 | 3-31-61 |
| 6 | 10,000 | 7-11 | | 16 | 10,000 | 2-27 | 3-31-61 |
| 7 | 5,000 | 7-15 | | 17 | 5,000 | 7-21 | |
| 8 | 5,000 | 7-26 | | | | | |
| 9 | 9,000 | 8-9 | 8-31-60 | Total | 150,130 | | |
| 10 | 10,000 | 9-20 | | | | | |

[1] Represents purchase price of property and incidental expenses incurred by Southwestern and transferred to Imperial.

---

[1] The advances from Southwestern to Imperial are referred to as loans herein, for purposes of convenience, since they were cast in that form, but this does not constitute a finding that they were, in fact, loans.

It has been stipulated that $12,000 of the above indebtedness actually reflected Southwestern's initial capital contribution and should therefore be deducted from the total amount of notes payable. Taking into account the notes which were paid off and the $12,000 initial capital, the notes payable account of Imperial reflected a net credit of $109,130 as of July 21, 1961.

All of the above notes were issued on the following note form:

$_____    _____ 19___

On demand after date, for value received, I promise to pay to Southwestern Investment Co., or order, at P.O. Box 116, Coachella, Calif. the sum of _____ Dollars, with interest at the rate of 6 per cent per year from date, until paid, interest payable annually, and if not so paid to be compounded annually, and bear the same rate of interest as the principal; and should the interest not be paid _____ then the whole sum of principal and interest shall become immediately due and payable at the option of the holder of this note. Principal and interest payable in lawful money of the United States.

(Signed) EDWIN C. HOLLENBECK, *Sec.*
IMPERIAL CONCRETE PRODUCTS

None of the above notes were secured and no interest was ever paid to or accrued by Southwestern.

Imperial began contracting for and building irrigation and drainage systems in April of 1960, and continued operating till October of 1961. The partners of Southwestern had decided by August or September of 1961 to have Imperial cease operations and began taking steps to convert Imperial's indebtedness to Southwestern into so-called "section 1244" [2] stock in order to claim an ordinary loss deduction if and when Imperial was liquidated.

Pursuant to this decision Imperial's board of directors adopted a resolution on October 28, 1961, the effect of which was to adopt a plan under which common stock was to be issued to Southwestern in cancellation of indebtedness. This plan was canceled when it was found that certain minor revisions were necessary and on November 29, 1961, a revised plan was adopted by the board of directors. The plan enabled the corporation to issue stock in cancellation of indebtedness held by Southwestern. Pursuant to this plan, on December 15, 1961, Imperial issued 1,091 shares of the newly authorized stock to Southwestern in cancellation of the then-existing indebtedness on their books which totaled $109,130. On brief petitioners have conceded that the partnership's basis in the stock is only $109,100. We are unclear as to why this concession was made but find as they request.

---

[2] All statutory references are to the Internal Revenue Code of 1954.

On December 23, 1961, the board of directors of Imperial elected to wind up and dissolve the corporation, and on December 29, 1961, all of the corporation's assets were distributed to, and all of its liabilities were assumed by, Southwestern in exchange for all of Imperial's stock. At the time of distribution the corporation's assets totaled $100,859.98, and its liabilities were $82,576.46, leaving a net worth of $18,283.52. Since there were 1,211 shares of stock outstanding, each share had a value of $15.09787.

The parties are in agreement that at the time Imperial adopted its plan to issue stock to Southwestern, the sum of the aggregate amount of stock which could have been issued under the plan plus the "equity capital" [3] of the corporation did not exceed $1 million. On the date the loss on the stock of Imperial was sustained (Dec. 29, 1961), the corporation had derived all its aggregate gross receipts from sources other than rents, royalties, dividends, interest, annuities, and sales or exchanges of stock or securities, and during the period of its operations the amount of deductions allowed the corporation under chapter 1 of the Internal Revenue Code exceeded the amount of its gross income.

The following summary of balance sheet data is drawn from a financial statement prepared by the corporation's accountant at the time an application to the California commissioner of corporations was made seeking authorization to issue stock in cancellation of indebtedness. It reflects the corporation's position as of October 31, 1961.

BALANCE SHEET

*October 31, 1961*

(prepared without audit)

ASSETS

| | Cost | Accumulated depreciation | Net book value | |
|---|---|---|---|---|
| Current assets: | | | | |
| Total current assets | | | | $42,170.17 |
| Fixed assets: | | | | |
| Total fixed assets | $201,567.89 | $31,196.01 | | 170,371.88 |
| Other assets: | | | | |
| Deposits | | | $2,036.00 | |
| Organization expense | | 411.68 | | |
| Less accumulated amortization | | 123.51 | 288.17 | |
| Total other assets | | | | 2,324.17 |
| Total assets | | | | 214,866.22 |

---

[3] As defined in sec. 1244(c)(2)(B), I.R.C. 1954.

LIABILITIES AND CAPITAL

Current liabilities:

| | | |
|---|---:|---:|
| Accounts payable | $30, 317. 63 | |
| Notes payable bank-secured by chattel mortgage | 16, 800. 00 | |
| Note payable—secured by first trust deed on land | 1, 800. 00 | |
| Purchase contracts payable | 30, 057. 48 | |
| Taxes payable | 799. 36 | |
| Total current liabilities | | $79, 774. 47 |

Long-term liabilities:

| | | |
|---|---:|---:|
| Note payable bank—secured by chattel mortgage | 30, 400. 00 | |
| Note payable—secured by first trust deed on land | 16, 200. 00 | |
| Purchase contracts payable | 48, 919. 39 | |
| Total | 95, 519. 39 | |
| Less—current portion shown above | 48, 657. 48 | |
| Net long-term liabilities | | 46, 861. 91 |
| Loans payable Southwestern Investment Co | | 124, 107. 96 |
| Total liabilities | | 250, 744. 34 |

Capital:

| | | |
|---|---:|---:|
| Capital stock authorized 150 shares—issued and retained 120 shares | 12, 000. 00 | |
| Surplus (deficit)—earnings (deficit) to Mar. 31, 1961 ($172. 50) | | |
| Earnings (deficit) Apr. 1, 1961 to Oct. 31, 1961 (47, 705. 62) | (47, 878. 12) | |
| Total capital (deficit) | | (35, 878. 12) |
| Total liabilities and capital | | 214, 866. 22 |

The figure of $124,107.96 on the above balance sheet which reflects Imperial's liability to Southwestern as of October 31, 1961, is $14,977.96 greater than the $109,130 which was stipulated to have been the amount of the liability on July 21, 1961, and December 15, 1961. This fluctuation in the amount advanced by Southwestern has not been explained.

OPINION

The petitioners were members of a partnership, Southwestern, which owned all the capital stock of Imperial. The only question presently before this Court involves the status of stock issued by Imperial to Southwestern in cancellation of the former's promissory notes. The petitioners contend that the stock was section 1244 stock and that therefore losses incurred upon its disposition were ordinary losses. There is no disagreement between the parties that the stock issued complied with the formal requirements of section 1244. However, the respondent asserts that although the stock was formally issued in cancellation of indebtedness, that in substance it was issued in exchange for stock (equity) and therefore it does not qualify as section 1244 stock and losses on its disposition are capital losses.

Section 1244 came into the Code as part of the Small Business Tax Revision Act of 1958. In general terms it provides ordinary loss treatment to the holders of stock in small businesses, the stock of which meets certain requirements. One of the purposes for which this legislation was enacted was to make capital more readily available to small businesses so that they could modernize and remain competitive with larger corporations which have access to the financial markets. Another purpose was to place a small business which had chosen to incorporate on an equal footing with unincorporated businesses of similar size by allowing investors in the incorporated business to deduct their losses as ordinary losses just as they would have been able to do if they had put their money into an unincorporated enterprise. H. Rept. No. 2198, 85th Cong., 1st Sess. (1958), 1959–2 C.B. 709.

One of the conditions for qualification as section 1244 stock is that it be issued in exchange for money or other property but not for stock or securities. Sec. 1244(c)(1)(D). The regulations amplify this requirement by providing that stock issued in consideration of cancellation of indebtedness of the corporation shall be deemed to have been issued for money or other property, but the section also provides that stock issued in exchange for stock or securities, including stock or securities of the issuing corporation, cannot qualify. Sec. 1.1244(c)–1(f)(1), Income Tax Regs.

The thrust of the legislative history makes it clear that section 1244 stock cannot be issued in exchange for stock or securities. The reason is that in many cases the stock or securities for which 1244 stock would issue would be the stock or securities of the issuing corporation, and in such cases no new capital is reaching the corporation. Rather, funds already committed to it are merely being reclassified for tax purposes, and without any attendant benefit to the corporation's financial position. See *Wesley H. Morgan*, 46 T.C. 878 (1966), and cases there cited. In the instant case, if the advances made by Southwestern were not already committed to Imperial, then their cancellation in return for the issuance of stock resulted in new capital flowing into the corporation. However, if these advances were in fact already so deeply committed to the corporation that they must be classified as either "stock or securities," then Imperial was in no better financial position for having converted its pro forma indebtedness into stock.

Whether the notes in the instant case were in reality equity capital (i.e., so deeply committed to the corporation that its financial position could not be realistically benefited by any change of characterization)

is a question of fact to be decided by reference to all the attendant circumstances. *John Kelley Co.* v. *Commissioner*, 326 U.S. 521 (1946) ; *Gooding Amusement Co.* v. *Commissioner*, 236 F. 2d 159 (C.A. 6, 1956), affirming 23 T.C. 408 (1954), certiorari denied 352 U.S. 1031 (1957). If so, this equity capital will fall within the above prohibition of the statute and regulations because, like stock, it is already furnishing the maximum benefit to the corporation's financial position. It is the substance of the economic relationship, not the form in which it is cast, that determines the incidence of the Federal income tax. *Gregory* v. *Helvering*, 293 U.S. 465 (1935).

Applying these two general principles, courts have examined the economic relationship created by "loans" and represented by "notes" in many areas of the tax law. This same debt-equity issue has arisen in connection with many different inquiries, some of which are: Whether a corporation is entitled to the interest deduction under section 163(a), *John Kelley Co.* v. *Commissioner, supra;* whether the nonrecognition provisions of section 351 apply when assets are transferred to a corporation in exchange for notes, *Gooding Amusement Co.* v. *Commissioner, supra;* whether a corporation is subject to the accumulated earnings tax imposed by section 531, *Gazette Telegraph Co.*, 19 T.C. 692 (1953), affd. 209 F. 2d 926 (C.A. 10, 1954) ; whether notes reacquired by a corporation represent indebtedness so that section 1017 may be availed of, *Universal Oil Products Co.* v. *Campbell*, 181 F. 2d 451 (C.A. 7, 1950), certiorari denied 340 U.S. 850 (1950) ; whether a corporation has more than one class of stock for purposes of determining if it is a "small business corporation" under section 1371(a), *W. C. Gamman*, 46 T.C. 1 (1966) ; whether a corporation qualifies for tax exemption under section 501, *Knollwood Memorial Gardens*, 46 T.C. 764 (1966) ; and whether a loss on a worthless "loan" was a capital loss under section 165(g), a business bad debt under section 166(a), or a nonbusiness bad debt under 166(d), *United States* v. *Henderson*, 375 F. 2d 36 (C.A. 5, 1967).[4]

The debt-equity inquiry is essentially the same in all areas. The precise determination to be made—is there more than one class of stock, are notes bona fide indebtedness, etc., varies from case to case, but the basic standards remain the same in all cases where the respondent seeks to reclassify debt or equity. The test is whether the form in which the taxpayer has cast the transaction has substantial economic reality. *Gilbert* v. *Commissioner*, 262 F. 2d 512 (C.A. 2, 1959), affirming a

---

[4] In this case the court commented :

"Although there is a plethora of precedent on the question of whether advances by a stockholder to a closely held corporation are to be considered as debts or contributions to capital, no single principle or test is controlling or decisive in making this determination. See, for example, Montclair, Inc. v. Commissioner of Internal Revenue, 318 F. 2d 38, 40 (5th Cir. 1963)."

Memorandum Opinion of this Court, certiorari denied 359 U.S. 1002 (1959).

After reviewing the cases which deal with the question of whether purported debt has substantial economic reality, we conclude that the following general requirements are among the most important that must be satisfied before purported debt can be said to have such substantial economic reality as to be treated as debt for tax purposes. It must have most of the formal attributes of debt, including an unconditional obligation to pay a fixed sum on demand or at a fixed maturity date in the not unreasonable future; a fixed rate of interest payable unconditionally; a preference over all classes of stock in liquidation, and an absence of voting rights at any time. The surrounding circumstances must indicate with reasonable certainty that the debt can be enforced according to its terms; and it must appear that the parties are in fact enforcing it according to its terms. Cf. *Ambassador Apartments, Inc.*, 50 T.C. 236, and cases there cited, on appeal (C.A. 2, Aug. 2, 1968).

In the instant case we first consider the status of the demand promissory notes given by Imperial to Southwestern as of the time they were converted into stock on December 15, 1961, because under the terms of section 1244, we are primarily concerned with what it was that was exchanged for stock. It seems obvious that the time of the exchange is the critical moment for such consideration.[5]

Although the character of the notes at the time of their creation is relevant in deciding what they are at a later time, it is not conclusive. Cf. *Cuyuna Realty Co.* v. *United States*, 382 F. 2d 298 (Ct. Cl. 1967), holding that notes (which may have been bona fide indebtedness for purposes of the issuer claiming an interest deduction at the time of their issuance) changed their character after the passage of time when it became apparent that the notes would never be collected.

Applying the above-mentioned general requirements to the instant case, we see that the notes in question had most of the formal attributes of debt. They were demand promissory notes. They were issued over a period of 15 months from early April 1960, when Imperial was formed,

---

[5] The language of the statute (sec. 1244(c) (1) (D)) is: "such stock was issued * * * for money or other property * * *"; and the language of the regulation (sec. 1.1244 (c)–1(f) (1), Income Tax Regs.) ; "The stock must be issued * * * for money or other property * * *."

Additionally, we note that in the instant case Imperial's plan under sec. 1244(c) (1) (A) was adopted only about 6 weeks (at most, or 17 days if the date of the revised plan is controlling—a question we need not decide) before this stock was issued. The true character of the purported notes had not changed during this short period of time. The same considerations which made them represent equity capital at the date of the exchange, operated to make them represent equity capital at the time the plan was adopted, and it is now axiomatic that "section 1244 stock" can only be issued after the adoption of the requisite plan. *Wesley H. Morgan*, 46 T.C. 878 (1966) ; and cf. *Roland E. Scott*, T.C. Memo. 1968–148.

to July 21, 1961, a month before the partners decided to cease operations. The notes bore a 6-percent interest rate payable annually; however, none was ever paid to or accrued by Southwestern. Three notes totaling $29,000 were paid off, but notes totaling $109,130 were outstanding after the last loan was made on July 21, 1961. None of the notes were secured.

Looking at the surrounding circumstances which bear on whether the "loans" could reasonably have been expected to be paid off, we note that at trial Wade Ellis, a partner of Southwestern, and a C.P.A. testified that in his opinion Imperial could not have gotten a bank loan after the business was started because it never developed the necessary cash flow or earnings. The fact that an outsider would not have made the "loans" in question is one factor which many courts have pointed to as evidence that purported debt was in fact not expected to be repaid according to its terms. *John Town, Inc.*, 46 T.C. 107, 131 (1966), affd. (C.A. 7, 1967).

We do not see how anyone could reasonably have expected that Imperial's notes to Southwestern would be repaid. The corporation lost money from the time it was incorporated, in fact, 1 month before the plan to issue stock in consideration of the cancellation of the notes was adopted (or 2 days thereafter if October 28, 1961, is considered to be the adoption date), Imperial's accountant prepared a balance sheet and an income statement which showed the corporation to have lost $47,706 in the first 7 months of fiscal 1961 and to have a cumulative deficit of $35,878 on October 31, 1961. Its balance sheet also showed current liabilities to be almost twice current assets, and it revealed that the corporation had incurred over $46,000 in secured indebtedness which was by definition senior to its unsecured loans from Southwestern. This secured indebtedness consisted of a chattel mortgage which the corporation gave a bank, and a mortgage on its real estate which it gave to an unnamed lender. The corporation never had more than $12,000 of invested capital, and in light of its indicated capital needs [6] of about 20 times that amount, we consider it unreasonable to have expected the amounts advanced by Southwestern to have been repaid. Whatever character the advances may have had at the time of their making, they had become irrevocably committed to the enterprise by October 28, 1961. They were then equity, and entirely at the risk of the business.

Turning now to the last of our three lines of inquiry, we examine how the obligations were in fact enforced. We note that from April 2, 1960, to the time the notes were canceled, December 15, 1961, 17 notes were issued. Of these three were paid off—in each instance the repay-

---

[6] As indicated by its Oct. 31, 1961, balance sheet.

**750**

ment occurred within less than 2 months from the time the note was issued—and the notes which were paid off were not paid in any particular sequence. No pattern of systematic repayment was shown, and it appears that some loans were made on a short-term basis with the understanding that they be paid off immediately. This would explain why the repayments were not applied to retire the oldest loans first. We also consider it significant that no interest was paid on any of the notes prior to their cancellation, even though the terms of the notes made interest due and payable on 13 [7] of the 14 notes at that time. Cf. *1432 Broadway Corporation*, 4 T.C. 1158 (1945), affirmed per curiam 160 F. 2d 885 (C.A. 2, 1947). The fact that no action was taken to accelerate the notes or to compound interest when the interest became overdue, and that after interest on the first note became due an additional loan was made, No. 17, persuades us that the loans were not being enforced according to their terms.

From the above, we see that even though the notes had the formal attributes of debt, they possessed none of the substantial economic realities of debt, and no attempt was made to enforce them according to their terms. We hold, therefore, from all of the above considerations, that Southwestern's advances constituted equity investments, or "stock," as that term is used section 1244(c)(1)(D). Accordingly, the stock issued to Southwestern in cancellation of "notes" was not "section 1244" stock and losses on its disposition are capital losses. Petitioners are therefore not entitled to ordinary loss treatment upon its disposition.

*Decisions will be entered for the respondent.*

---

[7] This figure was 11 at the time the "1244 plan" was adopted.