EDWARD GINSBERG AND ROSALIE GINSBERG, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ginsberg v. Commissioner
Docket No. 20323-89
United States Tax Court
T.C. Memo 1992-372; 1992 Tax Ct. Memo LEXIS 388; 63 T.C.M. (CCH) 3202; June 29, 1992
*388 Decision will be entered under Rule 155. Sheldon M. Sager and Mark B. Cohn, for petitioners. Jeffry J. Erney, for respondent. WELLS
WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined the following deficiencies in and additions to petitioners' Federal income taxes: Addition to Tax
Year
Deficiency
Sec. 6661(a)
1982
$ 12,791.00
$ 3,197.75
1983
39,323.50
-0-  1985
63,610.00
15,903.00
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issues we are asked to decide are: (1) Whether advances made by petitioners to a certain corporation are debt, as opposed to equity; (2) whether petitioners are entitled to ordinary losses under section 1244 for taxable year 1983; (3) whether petitioners are entitled to ordinary bad debt deductions under section 166 for taxable year 1985; (4) whether petitioners have established their entitlement to deduct certain automobile expenses disallowed by respondent for taxable year 1983; (5) whether petitioners are entitled to $ 284 of investment tax credit *389 for taxable year 1983; (6) whether petitioners failed to report $ 308 of interest income for taxable year 1983; (7) whether petitioners are entitled to a capital loss for taxable year 1985; (8) whether petitioner Edward Ginsberg's interest in the Chicago Sports Limited Partnership had an adjusted basis in excess of zero when it was sold during taxable year 1985; (9) whether petitioners are liable for self-employment tax for taxable year 1985; and (10) whether petitioners are liable for an addition to tax under section 6661 for taxable years 1982 and 1985. FINDINGS OF FACT Some of the facts and certain documents have been stipulated for trial pursuant to Rule 91. The stipulations of fact are incorporated herein by reference, irrespective of any restatement below. At the time petitioners filed their petition, they resided in Lyndhurst, Ohio. Petitioners filed joint Federal income tax returns for the taxable years in issue. Petitioner's Investment Background
During 1945, petitioner Edward Ginsberg (hereinafter petitioner) began practicing law and formed a law firm with two attorneys, Henry Gottfried and Sheldon Guren in Cleveland, Ohio. We briefly summarize petitioner's *390 long history of making investments for the purpose of generating fees for his law practice. Petitioner's investment career began by forming Radex Wire with four other investors for the purpose of acquiring a wire manufacturing company. During the 1950s, petitioner invested in Thistledown, a thoroughbred racetrack in Cleveland, Ohio. The investment led to petitioner's organization of the Ohio Thoroughbred Racing Association. Additionally, petitioner invested in Harvard Manufacturing (Harvard). As a result of petitioner's investment in Harvard, petitioner's law firm was retained to represent numerous additional entities, including Thrail Non-Ferrous Metals, Bore Light, Israel Discount Bank Investment Company, and TRW. During the 1960s, petitioner invested in Erie Sheet Steel Company and Investment Life Insurance Company. Petitioner also invested in U.S. Realty Investment Trust, a real estate development trust, and he invested in the management company which was formed to oversee the trust. Additionally, petitioner formed an investors' group to purchase a Cleveland radio station. Petitioner invested in Glencardage Transportation Company, Apartments for Living, and National Industries. *391 Petitioner, with additional investors, formed Advance Cleaning and GMG Chemical Company which were eventually merged into Aetna Cleaning Contractors. Petitioner invested in Hill Properties (Hill) as a retirement program. Mr. Guren and petitioner purchased S & E Shipping, a company that handled grain and ore shipping on the Great Lakes, and Great Lakes Towing. During the 1970s, Mr. Guren and petitioner invested in a company known as the Cleveland Stadium Corporation. During 1971, petitioner invested in Continental Bank. In 1974, however, Hill defaulted on notes that petitioner had signed which resulted in petitioner's bankruptcy. In 1978, subsequent to petitioner's bankruptcy, he invested in International Total Services (ITS). During the 1980s, petitioner invested in Metropolitan Satellite. Budd Nail Company
During 1980, petitioner and Robert Kearns formed a corporation, Budd Nail Company (Budd Nail), for the purpose of acquiring Angell Nail and Chaplet Company (Angell Nail), a business which had manufactured nails in Cleveland, Ohio, for over 60 years. When petitioner discovered Angell Nail, he was interested in acquiring a business that had growth potential and that *392 could become a good client. Petitioner's intention was to invest in a business, but he was not interested in directing its operations. On December 1, 1980, Budd Nail's common stock (the stock) was owned as follows: Percentage of
Owner
Shares
Shares Outstanding
Robert Kearns
10
33.33 percent
Marie Ruth Kearns
10
33.33 percent
Rosalie Ginsberg
4
13.33 percent
Robert Ginsberg
3
10 percent
William Ginsberg
3
10 percent
The issue price of the stock was $ 1,500 per share: $ 150 per share was the stated value and $ 1,350 was paid-in capital. Petitioners made 10 advances to Budd Nail: nine advances totaling $ 386,666.67 in exchange for notes and one advance from petitioner Rosalie Ginsberg of $ 100,000 for which petitioners have not produced a corresponding note (the $ 100,000 advance). We summarize the nine notes found in the record: Date
Name
Amount
Interest
Maturity
12-1-80
William Ginsberg
$  15,500.00
10%    10 years
12-1-80
Jan Ginsberg
15,500.00
10%    10 years
12-1-80
Rosalie Ginsberg
20,666.67
10%    10 years
9-17-81
Edward Ginsberg
100,000.00
[1] 0%    demand 11-16-81
Rosalie Ginsberg
35,000.00
16 1/2%
demand 12-28-81
Rosalie Ginsberg
50,000.00
16 1/2%
demand 1-13-82
Rosalie Ginsberg
50,000.00
16 1/2%
demand 1-20-82
Rosalie Ginsberg
50,000.00
16 1/2%
demand 3-16-82
Rosalie Ginsberg
50,000.00
16 1/2%
demand *393 No principal or interest was ever paid on the 10-year notes. Moreover, as payment was never demanded, Budd Nail never paid any interest or principal on the demand notes. All of the notes were subordinated: The 10-year notes were subordinated to all creditors and the demand notes were subordinated to Maryland National Industrial Finance Corporation (Maryland National). Additionally, none of the notes were secured. During December 1980, Budd Nail purchased the assets of Angell Nail for approximately $ 2.2 million. As of September 22, 1980, Angell Nail's machinery and equipment had an appraised value of $ 649,860. As of October 31, 1980, the value of Angell Nail's raw material and inventory was $ 215,210, and the value of the finished goods was $ 426,653.88. As of November 10, 1980, Angell Nail's real estate was appraised at $ 1.6 million. To finance the purchase of Angell Nail, Budd Nail borrowed $ 2.5 million from Maryland National, $ 1.5 million in the form of a secured term loan and $ 1 million in the form of a secured revolving loan. Maryland National placed numerous conditions *394 on the financing, including a provision that Budd Nail have an initial cash equity capitalization of at least $ 200,000. Initially, although petitioner did not intend to become actively involved in Budd Nail's day-to-day operations, he became very active in such operation. Petitioner and Mr. Kearns had meetings with Budd Nail's employees. Petitioner obtained supply sources, customers and outlets for the company, and made policy and operational decisions for Budd Nail. During February 1981, petitioner delivered 2,934 shares of U.S. Realty to Central National Bank (CNB) to secure a letter of credit for Budd Nail. [1]
During spring 1982, petitioner and Mr. Kearns decided that Budd Nail needed additional funds due to the company's deteriorating financial situation which had grown out of its production problems and the increasing cost of wire. Petitioner and Mr. Kearns also decided that changing from a manufacturing operation to a package operation *395 would be beneficial to Budd Nail. They attempted to raise funds by finding additional investors for Budd Nail; however, such efforts were not successful. During October 1981 through May 1982, petitioner devoted approximately one-third of his available working time to Budd Nail, and he drew a salary of $ 1,400 per month. After May 1982, because Budd Nail could no longer afford to pay petitioner, he agreed to forgo payments and did not receive further compensation for his efforts. In addition to his salary, petitioner was paid $ 13,500 for legal services he provided to Budd Nail. On June 1, 1982, in order to strengthen the company's balance sheet, Budd Nail's directors discussed a proposal to convert certain outstanding notes to capital stock. The directors' meeting minutes reflect the proposal: 200 shares of stock would be issued to petitioner Rosalie Ginsberg in exchange for the cancellation of the $ 100,000 advance; 100 shares of stock would be issued to Robert Kearns in exchange for the cancellation of advances in the amount of $ 50,000; and 100 shares of stock would be issued to Marie Ruth Kearns in exchange for the cancellation of advances in the amount of $ 50,000. According *396 to the minutes, the proposal was unanimously adopted. The converted shares were to have a combined value of $ 500 per share stated value and paid-in capital. The record does not contain any canceled notes or stock certificates. On July 30, 1982, Budd Nail filed for bankruptcy under Chapter 11, on Maryland National's suggestion. Budd Nail operated in Chapter 11 from July 1982 through September 10, 1985, with Maryland National's assistance through the continued financing of Budd Nail. Petitioner was active in deciding the best method of reorganizing Budd Nail. To assist Budd Nail in surviving the bankruptcy, petitioner attempted to attract new investors. Petitioner's efforts, however, failed. On September 10, 1985, Budd Nail was involuntarily placed in a Chapter 7 liquidation proceeding. Except for the corporate records referred to above, the record contains no other corporate records for Budd Nail. Chicago Professional Sports Limited Partnership
During the early 1970s, petitioner and other individuals formed the Chicago Professional Sports Limited Partnership (the partnership) for the purpose of acquiring the Chicago Bulls basketball team. During the early 1970s, *397 petitioner pledged his interest in the partnership as security for a debt he owed to Mr. Guren. As noted above, petitioner filed for personal bankruptcy in 1974. At that time, Mr. Guren received petitioner's interest in the partnership. In 1976, however, petitioner reacquired his interest in the partnership from Mr. Guren for $ 71,232. During 1985, petitioner sold his interest in the partnership for $ 331,804. On their return for taxable year 1985, petitioners reported petitioner's basis in the partnership interest return as $ 112,040. Petitioners also reported $ 12,124 as petitioner's share of the partnership's net loss for taxable year 1985. Alaned, Inc.
During 1984, petitioner received a liquidating distribution from Alaned, Inc. (Alaned), a corporation in which petitioner had an interest. Petitioners' son, Robert Ginsberg, issued a check drawn on petitioner's account to the Internal Revenue Service (IRS). The check was dated February 13, 1985, and was in the amount of $ 5,000. The notation "Alaned" appears on the lower left corner of the check. OPINION Debt vs. Equity
Petitioners contend that they are entitled to a $ 99,998 ordinary loss for taxable year *398 1983 under section 1244 for their loss on the sale of the Budd Nail stock they received in exchange for cancellation of the $ 100,000 advance. Petitioners also contend that they are entitled to bad debt deductions under section 166 for taxable year 1985 for petitioners' other advances to Budd Nail. Respondent contends that petitioners are not entitled to ordinary losses or deductions for the advances because the advances were capital contributions. We agree with respondent. Advances which are capital contributions do not give rise to ordinary bad debt deductions under section 166. Raymond v. United States, 511 F.2d 185, 189 (6th Cir. 1975). Moreover, although stock exchanged for cancellation of indebtedness may qualify for section 1244 treatment, if the canceled indebtedness is not in fact true debt, but is in reality equity, the stock received in the exchange does not qualify for section 1244 treatment. Hollenbeck v. Commissioner, 50 T.C. 740, 746 (1968), affd. 422 F.2d 2 (9th Cir. 1970); sec. 1.1244(c)-1(b) and (d), Income Tax Regs. In Hollenbeck, we explained the reason that section 1244 does not apply to stock *399 issued in exchange for equity: The thrust of the legislative history makes it clear that section 1244 stock cannot be issued in exchange for stock or securities. The reason is that in many cases the stock or securities for which 1244 stock would issue would be the stock or securities of the issuing corporation, and in such cases no new capital is reaching the corporation. Rather, funds already committed to it are merely being reclassified for tax purposes, and without any attendant benefit to the corporation's financial position. In the instant case, if the advances made by Southwestern were not already committed to Imperial, then their cancellation in return for the issuance of stock resulted in new capital flowing into the corporation. However, if these advances were in fact already so deeply committed to the corporation that they must be classified as either "stock or securities," then Imperial was in no better financial position for having converted its pro forma indebtedness into stock. Whether the notes in the instant case were in reality equity capital (i.e., so deeply committed to the corporation that its financial position could not be realistically benefited by any *400 change of characterization) is a question of fact to be decided by reference to all the attendant circumstances. If so, this equity capital will fall within the above prohibition of the statute and regulations because, like stock, it is already furnishing the maximum benefit to the corporation's financial position. It is the substance of the economic relationship, not the form in which it is cast, that determines the incidence of the Federal income tax. [Hollenbeck v. Commissioner, supra at 746-747; citations omitted.] The issue of whether advances are loans or capital contributions is a question of fact. Roth Steel Tube Co. v. Commissioner, 800 F.2d 625, 630 (6th Cir. 1986), affg. T.C. Memo 1985-58; Hollenbeck v. Commissioner, supra. Petitioners have the burden of proving that the advances were loans rather than capital contributions. Roth Steel Tube Co. v. Commissioner, supra.
The Sixth Circuit has identified 11 factors to be used in distinguishing loans from capital contributions: (1) The names given the instruments; (2) the presence or absence of a fixed maturity *401 date and schedule of payments; (3) the presence or absence of a fixed interest rate and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between creditor and stockholder; (7) the security for the advances; (8) the corporation's ability to obtain financing from lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund for repayments. Roth Steel Tube Co. v. Commissioner, supra. No single factor is decisive in the determination of whether advances are loans or capital contributions. Roth Steel Tube Co. v. Commissioner, supra.
The ultimate question is "whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship." Fin Hay Realty Co. v. United States, 398 F.2d 694, 697 (3d Cir. 1968). (Fn. ref. omitted.) Turning to the *402 factors of the instant case, of petitioners' 10 advances to Budd Nail, [2] petitioners have produced corresponding notes for 9 of such advances. Although petitioner testified that a note did exist for the $ 100,000 advance and that the note was canceled in exchange for stock, petitioners neither produced the note nor testified about its terms. Three notes had 10-year terms, while the remaining six notes were demand notes. All of the notes were unsecured, and no payments of principal or interest were ever made on any of the notes or the $ 100,000 advance. That a note is issued to evidence an advance indicates that the advance is a loan and not a capital contribution. Roth Steel Tube Co. v. Commissioner, supra at 631 (citing Stinnett's Pontiac Service, Inc. v. Commissioner, 730 F.2d 634, 638 (11th Cir. 1984), affg. T.C. Memo 1982-314). However, "an unsecured note due on demand with no specific maturity date, and no payments is insufficient to evidence a genuine debt." Stinnett's Pontiac Service, Inc. v. Commissioner, supra.
*403 Of the nine notes, only three had a fixed maturity date. No principal or interest payments were made to petitioners on any of the nine notes, and all of such notes were subordinated to creditors. Moreover, none of the terms of the $ 100,000 advance have been established. During the years in issue, Budd Nail's financial condition was in a state of continual deterioration. Although petitioner testified that he expected the advances to be repaid, petitioners have not demonstrated that they reasonably contemplated repayment within a short time. In Re Lane, 742 F.2d 1311, 1316 (11th Cir. 1984); Estate of Mixon v. United States, 464 F.2d 394, 404-405 (5th Cir. 1972). Of the nine notes, eight were interest bearing and one demand note did not require interest payments until demand had been made. Interest payments, however, were not made to petitioners on any of the nine notes or the $ 100,000 advance. Although the notes bear a fixed rate of interest, the fact that interest payments were never made is an indication that the advances were capital contributions. Roth Steel Tube Co. v. Commissioner, supra.As true creditors *404 are concerned with interest, a lender who does not insist on interest payments must be interested in the future earnings of the corporation or an increased value of shareholdings. Stinnett's Pontiac Service, Inc. v. Commissioner, supra at 640. If the expectation of repayment depends solely on the success of the borrowers' business, the transaction has the appearance of a capital contribution. Roth Steel Tube Co. v. Commissioner, supra. Only 3 months after Budd Nail purchased Angell Nail, petitioner was required to supply his own personal property to secure a letter of credit for Budd Nail. Subsequently, the financial affairs of Budd Nail continually worsened. Petitioners' only hope of recouping the advances they made subsequent to the initial advances on December 1, 1980, was for Budd Nail to be successful. Viewed in light of such circumstance, the advances take on the appearance of capital contributions. Inadequate capitalization is an indication that advances are capital contributions. Roth Steel Tube Co. v. Commissioner, supra at 630. Budd Nail was incorporated with $ 45,000 of equity and at least *405 $ 2.155 million in debt, making the company's initial debt to equity ratio in excess of 47 to 1. As noted above, only 3 months after Budd Nail was incorporated, petitioner was required to personally secure the letter of credit CNB provided to Budd Nail. Subsequently, from September 1981 through December 1981, petitioners advanced Budd Nail substantial sums of money. Finally, during 1982, petitioner personally repaid CNB the money that it had advanced to Budd Nail on the letter of credit. Budd Nail's capitalization was clearly inadequate to fund its operations. The fact that advances are made by shareholders in proportion to their respective ownership indicates capital contributions are being made rather than loans. Roth Steel Tube Co. v. Commissioner, 800 F.2d 625, 630 (6th Cir. 1986), affg. T.C. Memo. 1985-58. In contrast, a disproportionate ratio between a shareholder's percentage interest in stock and debt indicates a loan. Roth Steel Tube Co. v. Commissioner, supra.The only evidence in the record concerning the proportionality of the advances is petitioner's testimony that Mr. Kearns advanced Budd Nail $ 100,000 *406 in September 1981. Petitioners bear the burden of proving the advances were disproportionate. Rule 142(a). Petitioners, however, have not provided evidence of the amount of the advances made by all shareholders that would enable us to conclude that the advances were disproportionate. The advances were unsecured, which is an indication that they were capital contributions. Roth Steel Tube Co. v. Commissioner, supra at 631. As we have noted, Maryland National was fully secured on the money it advanced to Budd Nail and just 3 months after Budd Nail was incorporated, petitioner had to collateralize a letter of credit for Budd Nail with his personal property. In contrast, petitioners advanced Budd Nail money in exchange for unsecured, subordinate notes when the company's financial condition was continually deteriorating. Such actions do not appear to be similar to those that a reasonable creditor would undertake under the circumstances. That petitioners did not act in the manner that a rational creditor would act, indicates that the advances were capital contributions. Roth Steel Tube Co. v. Commissioner, supra at 631. Six of petitioners' *407 advances would be repaid only after Maryland National was satisfied, three advances would be repaid only after all creditors had been paid. Even the $ 100,000 advance would be subordinate to Maryland National by the terms of the financing agreement. Such subordination indicates that the advances were capital contributions. Roth Steel Tube Co. v. Commissioner, supra at 631-632. Advances which are used to meet daily operating needs of the corporation, rather than being used to purchase capital assets, indicate indebtedness. Roth Steel Tube Co. v. Commissioner, supra at 632. Although petitioner testified that the advances were used for working capital and not used for capital expenditures, the use of the funds for operating capital is only one factor and, standing alone, does not prove that the advances are true indebtedness. Finally, petitioners have failed to prove that Budd Nail established a sinking fund for repayment of the advances. The failure to establish a sinking fund is evidence that the advances were capital contributions. Roth Steel Tube Co. v. Commissioner, supra at 632. Considering the foregoing *408 factors, we cannot avoid the conclusion that petitioner's advances to Budd Nail were capital contributions. Accordingly, we hold that petitioners are not entitled to ordinary bad debt deductions under section 166 for taxable year 1985 or an ordinary loss under section 1244 for taxable year 1983. Raymond v. United States, 511 F.2d 185 (6th Cir. 1975); Hollenbeck v. Commissioner, 50 T.C. 740 (1968), affd. 422 F.2d 2 (9th Cir. 1970). Respondent alternatively determined that petitioners were not entitled to a capital loss for their advances because they failed to prove the year of worthlessness. The notice of deficiency is entitled to the presumption of correctness, and petitioners have the burden of proving that the notice is incorrect. Rule 142(a). As petitioners have failed to advance the alternative argument that they are entitled to a capital loss under section 166, they are deemed to have conceded the issue. Accordingly, we hold that petitioners are not entitled to a capital loss for the advances to Budd Nail. [3]
*409 Automobile Expenses
Respondent determined that $ 3,215 of petitioners' automobile expenses claimed on their Federal income tax return for taxable year 1983 were disallowed because petitioners had not established that such expenses were ordinary and necessary business expenses. The notice of deficiency is entitled to a presumption of correctness, and petitioners have the burden of proving that it is incorrect. Rule 142(a). As petitioners have neither offered evidence nor made any argument with respect to their entitlement to deduct such expenses, they are deemed to have conceded the issue and are not entitled to deduct such expenses. 1983 Investment Tax Credit
Respondent determined that petitioners were not entitled to $ 284 of investment tax credit claimed on their tax return for taxable year 1983 because they had not established that the automobile with respect to which they claimed the investment tax credit was used for business purposes. The notice of deficiency is entitled to the presumption of correctness, and petitioners have the burden of proving that it is incorrect. Rule 142(a). As petitioners have neither offered evidence nor made any argument with *410 respect to their entitlement to the $ 284 investment tax credit, they are deemed to have conceded the issue. Accordingly, petitioners are not entitled to the credit disallowed by respondent. Unreported Interest Income
Respondent determined that petitioners failed to report $ 308 of interest income during taxable year 1983. The notice of deficiency is entitled to the presumption of correctness, and petitioners have the burden of proving that it is incorrect. Rule 142(a). As petitioners have neither offered evidence nor made any argument with respect to such interest income, they are deemed to have conceded the issue. Accordingly, petitioners' income must be increased by $ 308. Alaned, Inc. Capital Loss
Respondent determined that petitioners were not entitled to the $ 5,000 capital loss they claimed under section 1341(a) in taxable year 1985 because they have failed to establish that they were entitled to the deduction. The notice of deficiency is entitled to the presumption of correctness, and petitioners have the burden of proving that it is incorrect. Rule 142(a). Petitioner testified that, during 1984, Alaned liquidated, that he received a liquidating distribution, *411 and that he subsequently received a notice of deficiency from the IRS stating that he owed the IRS money as an Alaned transferee. Petitioner produced a $ 5,000 check made to the order of the IRS which is marked with the notation "Alaned". The record, however, does not contain any additional evidence of petitioners' claimed capital loss. Petitioners argue on brief that their return for taxable year 1984 reflects the capital gain attributable to the liquidation of Alaned. That return, however, is not in the record. Moreover, the record contains no evidence of the amount of the tax and the reasons for which the tax is owed because the notice of deficiency also is not in the record. Consequently, we hold that petitioners have failed to meet their burden of proving their entitlement to the $ 5,000 capital loss that they claimed in taxable year 1985. Chicago Professional Sports Limited Partnership
Petitioners' return for taxable year 1985 reports an installment sale of petitioner's interest in the partnership. Respondent determined that petitioners had not established petitioner's basis in the partnership and increased their taxable income accordingly. The notice of deficiency *412 is entitled to a presumption of correctness, and petitioners have the burden of proving that the notice is incorrect. Rule 142(a). Petitioners' return for taxable year 1985 reports petitioner's basis in the partnership as $ 112,040. Petitioners contend, however, that the actual amount of the basis is $ 123,161. In support of petitioners' contention, petitioner testified that in 1976 he repurchased the partnership interest for $ 71,232, after he had forfeited it to Mr. Guren in 1974. Petitioner also testified that he made additional payments to the partnership for calls and was allocated losses during his ownership. The record includes a document substantiating petitioner's testimony concerning the repurchase of the partnership interest for $ 71,232. Additionally, petitioners' return for taxable year 1985 reflects a net loss for the partnership of $ 12,124. With respect to the calls and losses, respondent contends that an additional document, dated September 23, 1988, relied on by petitioners to substantiate petitioner's testimony, is unreliable because the document refers to exhibits which are not attached and is dated over 3 years after petitioners sold their partnership *413 interest. However, we accept petitioner's testimony in regard to the calls and losses and hold that petitioners have proved their basis in the partnership interest is $ 123,161. Self-Employment Tax
Respondent determined that petitioners were liable for self-employment tax for taxable year 1985 as a result of the disallowed bad debt deduction. The notice of deficiency has a presumption of correctness, and petitioner has the burden of proving that the notice is incorrect. Rule 142(a). Petitioners' only argument with respect to the self-employment tax hinges on their entitlement to bad debt deductions for taxable year 1985. Inasmuch as we have found that petitioners are not entitled to such deductions, we sustain respondent's determination. Section 6661(a)
Respondent determined that petitioners are liable for an addition to tax under section 6661(a) for taxable years 1982 and 1985. Section 6661(a) provides for an addition equal to 25 percent of a taxpayer's underpayment that is attributable to a substantial understatement of income tax. Section 6661(b)(2)(B) provides, however, that the understatement shall be reduced by the portion of the understatement for which *414 the taxpayer has substantial authority for such treatment or for which the facts affecting the tax treatment are adequately disclosed in the taxpayer's return. Petitioners contend that substantial authority exists for their tax treatment. To evaluate whether substantial authority supports a taxpayer's treatment of an item, the weight of the supporting authorities must be substantial in relation to the weight of the authorities supporting contrary positions. Sec. 1.6661-3(b)(1), Income Tax Regs. Furthermore, the authorities' weight is determined by the "same analysis that a court would be expected to follow in evaluating the treatment of the item." Antonides v. Commissioner, 91 T.C. 686, 702 (1988), affd. 893 F.2d 656 (4th Cir. 1990). "Thus, an authority is of little relevance if it is materially distinguishable on its facts from the facts of the case at issue." Antonides v. Commissioner, supra at 702-703. We have reviewed petitioners' authorities for their treatment and find that they are materially distinguishable from the facts of the instant case. Consequently, the authorities cited by petitioners are not substantial *415 authority. Accordingly, we hold that petitioners are liable for the section 6661 addition to tax. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. The note has no interest until demand and then bears interest of 8 percent after demand.↩
1. The record does not clearly reflect the terms of such letter of credit.↩
2. Respondent has argued that petitioners are not entitled to deductions for two of the notes which are issued in the names of William Ginsberg and Jan Ginsberg. We, however, need not reach that issue to resolve the issues regarding petitioners' claimed deductions in the instant case.↩
3. Respondent also determined that as a result of the disallowance of petitioners' bad debt deduction in 1985, petitioners are not entitled to a net operating loss carryback from 1985 to 1982, and an investment tax credit carryback from 1985 to 1982, as the investment tax credit was used in 1985. Because we have found that petitioners are not entitled to the bad debt deductions in 1985, we sustain respondent's related determinations. Rule 142(a)↩.