4 F.3d 993
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Edward GINSBERG and Rosalie Ginsberg, Petitioners-Appellants,
v.
COMMISSIONER OF THE INTERNAL REVENUE SERVICE, Respondent-Appellee.
 No. 92-2263.
 United States Court of Appeals, Sixth Circuit.
 Aug. 18, 1993.
 
 Before RYAN and BOGGS, Circuit Judges, and ECHOLS, District Judge.[1]
 PER CURIAM.
 
 
 1
 The Tax Court ruled that Edward and Rosalie Ginsberg, who are husband and wife, were not entitled to various tax deductions. The Tax Court also imposed a penalty for substantial underpayment of taxes. The Ginsbergs now appeal these rulings. For the reasons stated, we affirm the denial of the deductions. However, we reverse the ruling that the appellants must pay the maximum penalty for underpayment of taxes.
 
 
 2
 * Appellant Edward Ginsberg regularly invests in various start-up business, and also provides the legal work for these companies. Ginsberg characterizes his investments as a means for generating legal fees. He testified that he has invested in 23 companies in this manner. During 1980, Ginsberg and Robert Kearns formed a corporation, Budd Nail Company, for the purposes of acquiring Angell Nail and Chaplet Company, a business that had manufactured nails in Cleveland for 60 years. The company cost $2.2 million, but was independently appraised at $2.9 million.
 
 
 3
 To finance the purchase, Budd Nail borrowed $1.5 million from Maryland National Bank in the form of a secured term loan and $1 million in the form of a secured revolving loan. As a condition to the loan, Maryland National required Budd Nail to have at least $200,000 worth of initial capitalization. Budd Nail obtained this capitalization. $45,000 was labeled as equity investment, with $15,000 worth of stock being issued to the Ginsbergs and $30,000 to the Kearnses. An additional $155,000 also was provided. Of this $155,000, $51,667.67 came from members of the Ginsberg family: $20,666.67 from appellant Rosalie, $15,500 from William and $15,500 from Jan (Jan and William are the children of the appellants). The notes were subordinated to all creditors, and they were due 10 years after the date of issuance, with an interest rate of 10%, payable quarterly, with payment to commence on June 30, 1981. The Ginsbergs made six additional loans to Budd Nail. All of the loans are as follows:
 
 
 4
 DATE NAME AMOUNT INTEREST MATURITY
 
 
 5
 1. 12180 William 15,500 10% yearly 10 years
 
 
 6
 2. 12180 Jan 15,500 10% " 10 years
 
 
 7
 3. 12180 Rosalie 20,666.67 10% " 10 years
 
 
 8
 4. 91781 Edward 100,000 0%, 8% demand
 
 
 9
 after demand
 
 
 10
 5. 111681 Rosalie 35,000 16% yearly demand
 
 
 11
 6. 122881 Rosalie 50,000 16% " demand
 
 
 12
 7. 11382 Rosalie 50,000 16% " demand
 
 
 13
 8. 12082 Rosalie 50,000 16% " demand
 
 
 14
 9. 31682 Rosalie 50,000 16% " demand[2]
 
 
 15
 Ginsberg also testified that a $100,000 advance was made by Rosalie, which was later converted to stock, but no note evidencing that transaction was ever produced. No interest or principal payments were ever made by Budd Nail on any of the advances.
 
 
 16
 Edward Ginsberg indicated in a memorandum that his intention in forming Budd Nail was to acquire a business with growth potential, as well as generating legal fees. He took part in hiring the people who ran the business, and he and Kearns together held meetings with all employees. From October 1981 through May 1982, Edward devoted approximately one-third of his working time to Budd Nail, and he drew a salary of $1,400 per month. After May 1982, the company could no longer pay him. Ginsberg received $13,500 for legal services provided to the company, but he returned $10,000 of this amount to the company.
 
 
 17
 On June 1, 1982, the company decided to convert loans to stock to strengthen the company's books. The directors' meeting minutes reflects this decision: 200 shares of stock would be issued to Rosalie for the cancellation of a $100,000 advance (this is the advance for which there are no records), and the same was done for the Kearnses. In December 1983, the Ginsbergs sold this stock to George Blumenthal for two dollars.
 
 
 18
 On July 30, 1982, Budd Nail filed for bankruptcy. The company operated in Chapter 11 for three years. On September 10, 1985, Budd Nail was involuntarily placed into Chapter 7.
 
 
 19
 On their joint return for 1983, the Ginsbergs claimed an ordinary loss deduction of $99,998 as a loss on the sale of Budd Nail Stock, under I.R.C. Sec. 1244. The I.R.S. disallowed this deduction. On their joint return for 1985, the Ginsbergs claimed a business bad debt deduction under I.R.C. Sec. 166 in the amount of $268,824 for advances made to Budd Nail. They also claimed a $5,000 loss from an investment in a company called Alaned. The I.R.S. disallowed both of these deductions. The Commissioner also disallowed a number of other deductions, and imposed a penalty under I.R.C. Sec. 6661 for substantial underpayment of taxes.
 
 
 20
 The Ginsbergs then filed a petition for redetermination. The Tax Court held that the advances made to Budd Nail were capital contributions rather than loans. Accordingly, the court denied both the business bad debt deduction and the ordinary loss deduction. The court also held that because the Ginsbergs failed to advance the alternative argument that they were entitled to capital loss deductions, this argument was waived. The court also sustained the Alaned ruling and the penalty. This timely appeal followed.
 
 II
 
 21
 On their joint tax return for 1985, the year that Budd Nail was placed in Chapter 7 liquidation, the Ginsbergs claimed a fully deductible business bad debt loss in the amount of $268,824 for advances made to Budd Nail.[3] The Tax Court rejected this argument, finding that the advances were capital contributions, not loans.
 
 
 22
 Under Sec. 166(a), a deduction is allowed for any business debt that becomes worthless within the taxable year. Only bona fide debt can be deducted, and capital contributions are specifically excluded. Treas.Reg. Sec. 1.166-1(c). This court has identified eleven factors to be considered in determining whether bona fide debt exists. Roth Steel Tube Co. v. Commissioner, 800 F.2d 625, 630 (6th Cir.1986), cert. denied, 481 U.S. 1014 (1987). The Tax Court analyzed these factors, and concluded that the advances were actually capital contributions. This decision by the Tax Court constitutes a factual determination, reversible only if "clearly erroneous." Ibid.; Austin Village, Inc. v. United States, 432 F.2d 741, 744 (6th Cir.1970). The eleven factors are: 1) the name given to the instruments; 2) the presence or absence of fixed maturity dates and schedule of payments; 3) the presence or absence of a fixed rate of interest and interest payments; 4) the source of repayments; 5) the adequacy or inadequacy of capital contribution; 6) the identity of interest between the creditor and stockholder; 7) the existence of security for the advances; 8) the company's ability to obtain financing from outside sources; 9) whether the advances were subordinated to the claims of outside creditors; 10) whether the advances were used to acquire capital assets; and 11) the presence or absence of a sinking fund to provide repayment. Under this test, no single factor is conclusive. Id. at 630.
 
 
 23
 The first factor favors the taxpayers. The existence of instruments evidencing an indebtedness and the observance of formalities in connection with their execution supports a determination that the debt was bona fide. Curry v. Commissioner, 43 T.C. 667 (1965). In this case, all formalities were satisfied. The second and third factors are more problematic. Although the notes had a fixed maturity date, a schedule of repayment, and a fixed rate of interest, no payment was ever made, even though other creditors were timely paid. The absence of payment indicates that reimbursement was tied to the fortune of the company, and therefore indicative of an equity advance. Stinnett's Pontiac Service, Inc. v. Commissioner, 730 F.2d 634, 638 (11th Cir.1984). As stated by the Tax Court, "an unsecured note due on demand with no specific maturity date, and no payments is insufficient to evidence a genuine debt."
 
 
 24
 The fourth factor, sources of repayment, favors the Commissioner. This factor examines whether repayment is dependant upon the success of the enterprise. Burr Oaks Corp. v. Commissioner, 43 T.C. 635, 647 (1965), aff'd 365 F.2d 24 (7th Cir.1966), cert. denied, 385 U.S. 1007 (1967). The taxpayers claim that they never doubted that they would be repaid because Budd Nail's predecessor had been successful, and the company was purchased for less than its appraised value. However, this analysis ignores the fact that most of the loans were made when Budd Nail already was in trouble. The timing of the loans indicates that Edward Ginsberg was doing whatever he could to keep the company afloat. For instance, the final $150,000 loan was made to save the company from Central National Bank. Given these facts, the Tax Court's finding that the fourth factor favored the government was not clearly erroneous.
 
 
 25
 The fifth factor is capitalization. A finding of adequate capitalization would support a determination of bona fide indebtedness. A 3 to 1 ratio of debt to equity is considered acceptable, whereas a ratio in excess of that will invite scrutiny. B. Bittker and J. Eustice, Federal Income Taxation of Corporations and Shareholders, p 4.04 at 4-24 (4th ed. 1979). When determining debt to equity ratio, authorities uniformly use the "outside ratio," total liabilities to shareholders' equity. Ibid. Using this formula, the ratio in this case is 47.88 to 1 ($2.2 million purchase price minus $45,000 equity investment divided by $45,000). This ratio is indicative of undercapitalization.
 
 
 26
 The sixth factor concerns the identity of interest between the creditor and the stockholder. If advances are made by stockholders in proportion to their respective stock ownership, an equity contribution is indicated. Stinnett's Pontiac Service, Inc. v. Commissioner, supra. In this case, we do not know how much money the Kearnses put into the business. Without this information, we do not know whether the taxpayers' contributions were proportional. The seventh factor is the security, if any, for the advances. The Ginsbergs' advances were unsecured and so this factor favors the Commissioner.
 
 
 27
 The eighth factor is the ability of the company to obtain financing from outside sources. In this case, Budd Nail demonstrated this ability by obtaining financing from Maryland National Bank. Maryland National even continued to supply financing after the company entered bankruptcy. The ninth factor is whether the advances were subordinated to other creditors. Not only were the advances subordinated, but no interest payments were ever made. This factor favors the Commissioner. The tenth factor examines whether the advances were used to acquire capital assets. The advances were for working capital, and so this factor favors the taxpayers. Finally, the eleventh factor favors the government. There was no fund for repayment. Looking at all of these factors, the Tax Court's conclusion was not clearly erroneous. A majority of the factors favor the government.[4]
 
 
 28
 Similarly, the appellants' argument that they were entitled to a Sec. 1244(a) deduction on the sale of stock must be rejected. Section 1244(a) of the Internal Revenue Code permits an individual taxpayer to deduct as an ordinary loss any loss on the sale or exchange of Sec. 1244 stock. Section 1244 stock is defined as common stock issued for money or other property (other than stock or security) by a domestic small business corporation, 50 percent of whose income does not come from investment activity. The Ginsbergs attempted to gain a Sec. 1244 tax deduction on their sale of the $100,000 worth of stock for $2.
 
 
 29
 The Tax Court properly rejected this argument. To obtain the deduction, the Ginsbergs needed to show that their original investment was a loan, not a capital contribution. Hollenbock v. Commissioner, 50 T.C. 740 (1968), aff'd, 422 F.2d 2 (9th Cir.1970) (where money was already deeply committed to the company by the owners, a reclassification could not benefit the company, and so Sec. 1244 stock was not created). As discussed, the loans made to the Ginsbergs constituted capital advances. Accordingly, we reject the appellants' argument.[5]
 
 III
 
 30
 The Tax Court first rejected the appellants' request for an ordinary-loss treatment. The court also denied a capital loss deduction for both the sale of the stock and the $268,824 loss. The court reached this result because the appellants failed to request capital loss treatment.
 
 
 31
 Section 165 authorizes a deduction for any loss sustained during the taxable year that is incurred in a trade or business, or a loss from a worthless security. A taxpayer may deduct a Sec. 165 loss "only for the taxable year in which the loss is sustained," Treas.Reg. 1.1651(d)(1), and the burden rests on the taxpayer to show the year of worthlessness. Boehm v. Commissioner, 326 U.S. 287, 292 (1945). Appellants now request capital loss treatment. However, they failed to raise this issue below, and therefore we cannot entertain the argument at this juncture. Singleton v. Wulff, 428 U.S. 106, 120 (1976); United States v. Berman, 825 F.2d 1053, 1056 (6th Cir.1987).
 
 IV
 
 32
 Petitioner Edward Ginsberg alleges that in 1984 he received a liquidating distribution in the amount of $9,922 from Alaned, Inc., a company in which he held an interest. He then reported this amount as a long-term capital gain on his 1984 Schedule D and paid the corresponding tax. In 1985, petitioner allegedly received a notice from the I.R.S. advising him of a $5,000 deficiency in Alaned and that, as an owner of the dissolved corporation, he would be held liable for this deficiency. Ginsberg accordingly directed his son to make payment. Petitioner claimed a long-term capital loss on his 1985 federal income tax return in connection with this payment on behalf of Alaned, Inc. The Schedule D appended to the return indicated that petitioner was claiming the loss under the authority of Sec. 1341.
 
 
 33
 Section 1341 sets out both the requirements and mechanics of this relief provision. The section requires: 1) that an item was included in gross income for a prior taxable year and that at that time it appeared that taxpayer had an unfettered right to such income; 2) that a deduction is allowable for the current year because it was established after the close of that prior year that the taxpayer did not have a right to this deduction; and 3) that the amount of the deduction exceeds $3,000. The appellants argued that they had satisfied this criteria. However, the I.R.S. disallowed the deduction, and the Tax Court agreed. The Ginsbergs now appeal this ruling.
 
 
 34
 Appellant cannot prevail because he failed to put forth evidence to support his position. He never introduced his 1984 return to show the relationship between the 1984 gain and 1985 loss. Appellant also did not submit the I.R.S. deficiency notice that requested payment on behalf of Alaned. Because he did not present this evidence, appellant failed to meet his burden. Estate of DeNiro v. Commissioner, 795 F.2d 582, 584 (6th Cir.1986) (the Tax Court need not accept a taxpayer's uncorroborated testimony, but rather, the taxpayer must put forth actual evidence to support his position).
 
 V
 
 35
 The government imposed a penalty under I.R.C. Sec. 6661 for substantial underpayment of taxes. Section 6661 provides for an addition to taxes in the amount of 25 percent for a substantial understatement of income taxes. There is substantial understatement for the tax year if the amount of the understatement exceeds the greater of $5,000 or 10 percent of the corrected tax liability. The amount of the understatement may be reduced if the taxpayer can show "substantial authority" for his position. The appellants now argue that they had substantial authority for their position, and therefore the penalty should have been reduced.
 
 
 36
 "Substantial authority" is defined by the Treasury Regulations as "less stringent than a more likely than not standard ... but stricter than a reasonable basis standard...." Treas.Reg. 1-1611-3(b)(1). In Moser v. Commissioner, 56 T.C.M. 1604, 1607 (1989), aff'd, 914 F.2d 1040 (8th Cir.1990), the Tax Court echoed the regulations when it held that the standard "is not so stringent that a taxpayer's tax treatment must be treatment which is ultimately upheld in litigation...." The Regulations also state that "[t]here may be substantial authority for the tax treatment of an item despite the absence of certain types of authority. Thus, a taxpayer may have substantial authority for a position that is supported only by a well-reasoned construction of the applicable statutory provision." Treas.Reg. Sec. 1.6661-3(b)(3). The taxpayer bears the burden of showing substantial authority, and this question is entitled to de novo review. Norgaard v. Commissioner, 939 F.2d 874, 877 (9th Cir.1991).
 
 
 37
 The substantial understatements arose solely out of the Commissioner's disallowance of taxpayer's claimed bad debt deduction for 1985. Regarding this issue, the Ginsbergs presented a strong case for their position. As discussed above, many factors favored the appellants. The appellants presented "a well-reasoned construction of the applicable statutory provision." Treas.Reg. Sec. 1.6661-3(b)(3). Accordingly, we find that the Ginsbergs had substantial authority for their position.
 
 
 38
 For the reasons stated, we AFFIRM the denial of the tax deductions. We REVERSE on the final issue based upon the substantial authority for the appellants' position, and REMAND for proceedings consistent with this opinion.
 
 
 
 [1]
 The Honorable Robert L. Echols, United States District Judge for the Middle District of Tennessee, sitting by designation
 
 
 [2]
 During February 1981, Edward delivered 2,934 shares of U.S. Realty stock to Central National Bank to secure a letter of credit for Budd Nail. Upon demand by Central National, Ginsberg paid the bank $150,000, and the final $150,000 in loans detailed above evidences the company's obligation to repay him for his payment to Central National
 
 
 [3]
 This figure is the amount of loans made by the Ginsbergs to the company, minus the amount they received in the Chapter 7 liquidation.4 This decision makes it unnecessary for the court to determine whether the debts were business or non-business related, as only business debts are entitled to favorable tax treatment under Sec. 166
 
 
 [5]
 Appellants now argue that, assuming the original advance constitutes a capital contribution, they still should be entitled to the deduction because they simply exchanged Sec. 1244 stock for other Sec. 1244 stock. Appellants did not raise this argument below, and therefore waived it. Singleton v. Wulff, 428 U.S. 106, 120 (1976); United States v. Berman, 825 F.2d 1053, 1056 (6th Cir.1987). Moreover, the original advance did not create Sec. 1244 stock, as no stock was issued at that time. Miller v. Commissioner, 58 T.C.M. p 89,153 (1989) (to create Sec. 1244 stock, stock must actually be issued)